TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-07-00040-CR






Lawrence David Hernandez, Appellant


v.


The State of Texas, Appellee






FROM THE DISTRICT COURT OF COMAL COUNTY, 207TH JUDICIAL DISTRICT

NO. CR2006-115, HONORABLE JACK H. ROBISON, JUDGE PRESIDING





M E M O R A N D U M O P I N I O N


 Lawrence Hernandez was found guilty of indecency with a child by contact. See Tex.
Penal Code Ann. § 21.11 (West 2003). On appeal, Hernandez argues that the district court was
biased against him, that the district court erred by allowing the State to introduce inadmissible
evidence, and that the district court improperly prevented him from cross-examining witnesses. We
will affirm the judgment of the district court. 


BACKGROUND

 Hernandez is the grandfather of the alleged victim in this case, N.C., and is the father
of N.C.'s mother, Lillian Cruz. Lillian is married to N.C.'s father, Eric Cruz. At the time of the
alleged offense, N.C. was eight years old. 

 On June 29, 2005, Eric and Lillian left their house to complete the purchase of a new
home. Before leaving, they asked their niece, G.G., to watch over N.C. and their three other 
children. Hernandez was also in the Cruzes' house at the time they left their home. After the Cruzes
left, Hernandez began drinking. 

 At the time of the allegedly improper contact, Hernandez was sitting on a bar stool
in the kitchen along a counter that divided the kitchen from the dining room, and N.C., one of her
siblings, and G.G. were playing in the dining room. While sitting on the stool, Hernandez asked
N.C. to walk over and give him a hug. What transpired after that request forms the basis for this case
and will be discussed more thoroughly later. After the allegedly improper behavior occurred, N.C.
went back to the dining room. 

 When the Cruzes returned home, Lillian noticed that Hernandez was drunk and told
him to go to one of the bedrooms to sleep. Before he went to bed, Hernandez asked N.C. and the
other children to give him a kiss goodnight. After Hernandez went to bed, N.C. told Lillian that
something inappropriate had occurred between her and Hernandez while the Cruzes were gone. 
Lillian then woke Hernandez up and told him to leave the house. Once Hernandez left the house,
Lillian called the police. 

 Officer Randall Bryan responded to the call. When Officer Bryan arrived at the
Cruzes' home, Lillian told him what N.C. had said. After talking with Lillian, Officer Bryan left the
Cruzes' home to look for Hernandez. Several hours later, Officer Bryan found Hernandez in the
parking lot of a fast food restaurant. After observing Hernandez, Officer Bryan believed that
Hernandez was intoxicated and was a danger to himself and others; accordingly, Officer Bryan
arrested Hernandez for public intoxication. See id. § 49.02 (West Supp. 2009). 

 A few days after Hernandez was arrested, N.C. was interviewed at the Seguin
Children's Advocacy Center (the "Center") by one of its employees, Kristi Williams. Eventually,
Hernandez was charged with indecency with a child by sexual contact. See id. § 21.11 (explaining
that person commits offense if person engages in sexual contact with child, which includes touching
any part of child with person's genitals, even through clothing, provided that touching was made
with intent to arouse or gratify sexual desire). Hernandez pleaded not guilty to the charges. 

 A trial ensued, various witnesses testified, and the State introduced evidence of
Hernandez's prior convictions for attempted indecency with a child. See id.; see also id. § 15.01
(West 2003) (explaining criminal attempt). After the trial ended, the jury found Hernandez guilty. 
During sentencing, Hernandez pleaded true to two enhancements arising from his prior convictions. 
The jury sentenced Hernandez to twenty-five years' imprisonment. 

 Hernandez appeals the judgement of the district court. 


Evidence Presented at Trial

 Because the evidence presented at trial is relevant to the issues raised on appeal, we
will summarize it here. During the trial, Lillian and Officer Bryan provided testimony regarding the
night of the arrest. In addition, evidence was also introduced regarding conversations Lillian and
Eric had with N.C. and their other children after the incident and regarding Lillian's and Eric's
beliefs about whether criminal contact had occurred. Further, the State introduced a video of the
interview N.C. gave at the Center, and N.C. testified regarding the allegedly improper interaction
with Hernandez and about her interview. Finally, the State introduced evidence regarding
Hernandez's prior convictions. 


Night of the Arrest

 During the trial, Lillian testified that Hernandez had not consumed any alcohol prior
to her leaving the house on the night of the incident but that Hernandez was intoxicated when she
came back home. In addition, Lillian stated that when she came home, N.C.'s demeanor was slightly
different and that N.C. was "very clingy." 

 Lillian also testified that shortly after she returned home on the night in question, N.C.
told her that something inappropriate happened while she was gone. In particular, Lillian stated that
N.C. told her that while she and Eric were gone, Hernandez asked N.C. to give him a hug; that
Hernandez was sitting on a stool when he made the request; that Hernandez and N.C. held hands;
that Hernandez placed the hands "down here"; that while they were holding hands, the hands "went
this way . . . together"; and that while they were holding hands, the hands were placed in the "private
area." Later, Lillian agreed that N.C. had said that Hernandez had moved her hand towards the
"private area" and that N.C. said she became uncomfortable when her hand stopped. Lillian also
stated that after her daughter told her that an uncomfortable exchange occurred, she did not ask for
more details prior to calling the police. Further, Lillian testified that after the police arrived, she told
the responding officer, Officer Bryan, that she did not want to press charges against Hernandez
at that time. 

 In his testimony, Officer Bryan confirmed that when he arrived on the scene, Lillian 
stated that she did not want to press charges against Hernandez, but he also stated that Lillian told
him that she did not want Hernandez to return to the house. In addition, Officer Bryan stated that
Lillian informed him that after she arrived home, she noticed that N.C. was "very clingy, acting
unusual, and that she was clinging to herself. Everywhere she went, her daughter was following her,
which was out of character for [N.C.]" Moreover, Officer Bryan revealed that Lillian informed him
that her daughter "cried out that she had been improperly contacted by her grandfather . . .
[s]exually." (1) 


After the Arrest

 During the trial, a letter that had been written by Lillian after Hernandez was arrested
was admitted into evidence. Before trial, Lillian prepared the letter and instructed Hernandez's
attorney to forward it to the district attorney's office. In the letter, Lillian wrote that prior to calling
the police, she "did not allow [herself] time to ask questions and make sense of anything, and in a
split second [she] called the police to escort [her] father out of [her] home." Further, she wrote that
she did not press charges when the police arrived because she "wasn't exactly clear of details"
and that she has come to believe that she "jumped to conclusions and prematurely called the
police that night." 

 The letter communicated Lillian's belief that her father, in an inebriated state,
clumsily dropped his arms on top of N.C.'s, which caused N.C.'s hand to land "too high on his lap." 
Further, Lillian wrote that she asked her daughter specifically what happened and that N.C. stated
that Hernandez did not force her hand to his private area, that her hand was on his lap for only a
second or two, that no rubbing occurred, and that nothing else inappropriate occurred. Additionally,
although the letter stated that Hernandez did kiss N.C. before he went to bed, the letter also stated
that he kissed all of Lillian's children before he went to bed. Morever, Lillian wrote that neither she
nor her husband saw anything inappropriate happen when Hernandez kissed the children. 

 In her testimony, Lillian repeated many of the assertions made in her letter and also
provided some additional information. In particular, Lillian testified that it was not unusual for N.C.
or any of her children to be on Hernandez's lap because her children love Hernandez and climb all
over him. In addition, Lillian said that after Hernandez had been arrested, she discussed the matter
more thoroughly with N.C., and N.C. informed her that the touching at issue only lasted one or two
seconds. Moreover, Lillian explained that N.C. stated that during the touching she did not feel
Hernandez's penis or "anything at all." Furthermore, Lillian denied that N.C. ever said that
Hernandez patted N.C.'s hand. In addition, Lillian stated that N.C. never said that Hernandez forced
her to keep her hand anywhere, never communicated that Hernandez was attempting to obtain sexual
gratification through the touching, and never said that she was afraid Hernandez was going to force
her to engage in sexual conduct. In fact, Lillian testified that after Hernandez had been arrested, N.C.
said that she did not think Hernandez had done anything wrong. Further, Lillian stated that she
talked with her other children and that none of them noticed anything improper that evening or stated
that N.C. started behaving differently after her interaction with Hernandez. Finally, Lillian testified
that after more thoroughly investigating the matter, she came to the conclusion that Hernandez did
not intend for anything improper to occur and that any improper touching was inadvertent and brief. (2) 
 Eric provided similar testimony during the trial. In particular, he stated that he asked
his daughter what had happened that evening and that she said Hernandez "just kind of placed" her
hand "close to the groin area." Moreover, he stated that N.C. never said the word "penis" when she
described the incident. Additionally, he expressed his belief that Lillian should not have involved
the police without discussing the matter more thoroughly because "I think it might have been a
misunderstanding." Finally, he stated that after talking with N.C. on the evening of the incident, he
came to the conclusion that the touching was accidental and not sexual in nature. (3) 


N.C.'s Interview and Testimony

 During the trial, the State played a videotape of N.C.'s interview at the Center. In the
interview, N.C. was asked to look at drawings of a male and a female and to identify various parts
of the body. Among other body parts, N.C. was asked to state what words she used to refer to the
male and female genital regions, and N.C. stated that she called them "private parts." 

 Regarding the incident with Hernandez, N.C. stated that when she hugged her
grandfather, she put her hand on her grandfather's side and that Hernandez moved it down. When
Williams asked where Hernandez moved her hand to, she pointed to the area on the male drawing
that she had referred to as the "private parts." Later, N.C. stated that Hernandez grabbed her hand,
moved it down to the "private parts," and then patted her hand. In addition, N.C. stated that
Hernandez did not say anything to her when he moved her hand. In response to a question by
Williams, N.C. said that she felt Hernandez's private parts; however, N.C. also stated that she did
not feel anything and that she did not feel anything hard or soft. Furthermore, N.C. communicated
that although Hernandez was holding her tight, she was able to get away when she tried and that
Hernandez only held her hand for one or two seconds. 

 In the interview, N.C. also stated that her grandfather was very drunk on that evening
and indicated that he was unstable on his feet. Moreover, she said that seeing her grandfather in that
condition upset her because she had never seen him like that before. Finally, N.C. stated that after
her parents came home, Hernandez kissed her on the mouth and that his mouth was open. 

 During the trial, N.C. testified regarding the incident and regarding her interview at
the Center. Regarding the incident, N.C. stated that while he was sitting on the bar stool, Hernandez
asked her to give him a hug. N.C. commented that Hernandez was drunk when he made the request
and that his condition made her uncomfortable. In addition, N.C. stated that Hernandez stayed
seated when she came to give him a hug and that she hugged him from the side. Further, she
testified that when she was hugging Hernandez, her hand landed on the side of his stomach or
somewhere near his private parts and that Hernandez moved her hand to "somewhere by his private
parts" or "[o]n his private parts" or "private area." She also stated that her hand only stayed there
for a second or two. Further, N.C. explained that Hernandez did not pat her hand while it was on
or near his private parts and that no rubbing or anything inappropriate happened. Moreover, she
testified that she did not feel Hernandez's private parts; instead, she stated that she only felt
Hernandez's leg. N.C. then testified that although she felt uncomfortable, she believed that the
inappropriate touching was accidental in nature. Furthermore, N.C. explained that after she started
feeling uncomfortable, she went back to the dining room and that Hernandez did not try to keep her
from leaving the kitchen. 

 In addition, N.C. testified that after her parents came home and when Hernandez was
going to bed, Hernandez gave her a hug and kissed her on the mouth. Although she testified that she
did not like the hug and kiss, she also stated that Hernandez hugged and kissed her siblings as well. 

 Regarding the video of her interview at the Center, N.C. stated that she was confused
when she answered some of the questions asked by Williams. Moreover, she testified that she had
not been truthful when she said that she had felt Hernandez's private parts. 

 

Prior Convictions

 As mentioned earlier, during the guilt/innocence phase of the trial, the State
introduced evidence regarding some of Hernandez's prior criminal acts. First, the State called J.V.,
one of the victims from the prior crimes, and Nancy Varchus, J.V.'s mother, to testify regarding
Hernandez's prior convictions for attempted indecency with a child. 

 The State then called Randy Graef, a probation officer, to testify regarding those prior
convictions. During Graef's testimony, the pre-sentence investigation report that had been prepared
when Hernandez pleaded guilty to the attempted indecency charges was admitted into evidence. 

 

DISCUSSION

 Hernandez raises four related issues on appeal. First, Hernandez contends that the
district court was biased against him and, thereby, denied him his constitutional right to a fair trial. 
Second, Hernandez asserts that the district court erred by failing to give a requested limiting
instruction to the jury, by allowing in hearsay evidence, by allowing in evidence that improperly
bolstered the State's case, and by allowing the State to call witnesses for the purpose of impeaching
the witnesses with otherwise inadmissible evidence. Third, Hernandez argues that the district court
erred by allowing in evidence of Hernandez's prior convictions, including the pre-sentence
investigation report prepared when he pleaded guilty to the prior convictions. Finally, Hernandez
contends that the district court erred by denying him the right to properly cross-examine witnesses. 
Because Hernandez incorporates arguments made in his subsequent issues into his prior issues, we
will address his arguments in reverse order. 


Fourth Issue

 In his fourth issue, Hernandez argues that the district court erred by prohibiting him
from fully cross-examining N.C. Appellate courts review trial court's limitations on cross-examination for an abuse of discretion. See Billodeau v. State, 277 S.W.3d 34, 43 (Tex. Crim. App.
2009). Accordingly, appellate courts do not reverse a court's decision provided that the ruling "was
within the zone of reasonable disagreement." Montgomery v. State, 810 S.W.2d 372, 391
(Tex. Crim. App. 1991) (op. on reh'g). In other words, if reasonable individuals can disagree about
the decision, an appellate court should not reverse the trial court's determination. See id. 

 In making his argument on appeal, Hernandez refers to an exchange that occurred
after N.C. was asked to watch a portion of her interview at the Center in order to refresh her memory. 
See Tex. R. Evid. 803(5) (allowing use of prior statement to refresh memory of witness who no
longer has sufficient recollection of event to testify fully). After N.C. finished watching the video,
Hernandez, outside the presence of the jury, asked the district court for permission to "voir dire her
and question her a little bit on this issue." After the district court granted permission, Hernandez
inquired whether various statements N.C. made in the video were true or whether she made the
statements because she was nervous. In answering his questions, N.C. stated that she did not feel
Hernandez's penis and stated that no one had told her to change her story. Then, Hernandez asked
N.C. whether in response to a question by Williams, she had told Williams that Hernandez prevented
her from leaving the living room. When N.C. answered in the negative, Hernandez stated, "Even
though [Williams] says it, it's not true." At this point, the State objected to the statement as being
outside the scope of determining whether the video refreshed N.C.'s memory, and the district court
sustained the objection. After initially objecting to the district court's ruling on a different ground,
Hernandez then argued that his ability to cross-examine the witnesses was being
improperly restricted. 

 In light of this exchange, Hernandez argues on appeal that he was improperly denied
the opportunity to cross-examine N.C. regarding whether she lied to Williams and whether Williams
bullied N.C. into making false statements. See London v. State, 739 S.W.2d 842, 846 (Tex. Crim.
App. 1987) (explaining that in general, party is entitled "to show any relevant fact which would or
might tend to establish ill feeling, bias, motive, interest or animus on the part of any witness
testifying against him"). In other words, Hernandez contends that the district court prohibited him
from delving into N.C.'s potential motivations for not telling the truth. Further, Hernandez insists
that the district court's decision deprived him of his "right to present a defense" in violation of the
federal and Texas constitutions. See U.S. Const. amend. VI; Tex. Const. art. I, § 9. 

 When making its ruling, the district court did not prohibit Hernandez from
questioning N.C. regarding whether she had been pressured to lie during the interview. Rather, the
court ruled that any more questions regarding the interview were "going to be in front of the jury."
Moreover, when Hernandez stated that he felt his ability to cross-examine was being improperly
restricted, the court informed Hernandez that he was free to continue questioning N.C. but that the
questioning would be done in front of the jury. After the court made its ruling, Hernandez continued
to question N.C. (4) and repeatedly asked her whether she had been truthful during her interview at
the Center. (5) 

 In light of the preceding, we cannot conclude that the district court abused its
discretion by improperly restricting Hernandez's right to cross-examine witnesses. Although the
district court did prohibit Hernandez from asking N.C. certain questions outside the presence of the
jury during a hearing called for a limited purpose, the district court imposed no such restrictions
regarding his ability to cross-examine the witnesses in front of the jury. See Billodeau, 277 S.W.3d
at 43 (stating that trial court may impose reasonable restrictions on cross-examination). 
Accordingly, we overrule Hernandez's fourth issue on appeal. 


Third Issue

 In his third issue, Hernandez contends that the district court erred by allowing in
evidence of his prior convictions, by admitting the pre-sentence investigation report prepared when
he pleaded guilty to the prior crimes, and by admitting the videotape of N.C.'s interview at the
Center. Hernandez argues that all of these decisions by the district court were contrary to the rules
of evidence.


Prior Convictions

 As discussed earlier, the district court allowed the State to introduce evidence
establishing that Hernandez had previously been convicted of two counts of attempted indecency
with a child. In particular, the State called J.V., one of the victims from the prior crimes, and Nancy
Varchus, J.V.'s mother, to testify regarding the prior criminal misconduct. J.V. testified that in 1994,
when she was eight years old (the same age as N.C. at the time of the alleged offense at issue), she
noticed a man in a Santa Claus costume sitting on a park bench near a playground. Further, J.V.
stated that after she went over to talk to the man, the man placed a hand on her breast and
on her genitals. 

 In her testimony, Nancy stated that she saw a man dressed in a Santa outfit sit down
on a park bench and call J.V. and another girl over to him. Further, Nancy testified that after the
girls went over to talk to him, she saw the man place his hands inside both J.V.'s and the other girl's
pants. In addition, Nancy stated that after she saw what the man had done, she started screaming and
ran after him. Moreover, Nancy communicated that when she caught up with the man, she noticed
that he smelled like alcohol. Finally, Nancy stated that she called the police and that Hernandez
eventually pleaded guilty to two counts of attempted indecency with a child by contact. 

 During the trial, Hernandez objected to the admission of the evidence on the grounds
that the prior convictions were being improperly admitted for the purpose of proving Hernandez's
character and that the prior convictions were highly prejudicial. See Tex. R. Evid. 403, 404(b). On
appeal, Hernandez again urges that the evidence of his prior convictions was inadmissible under the
rules of evidence. (6) 


 Rule 404

 In general, "[e]vidence of other crimes . . . is not admissible to prove the character
of a person in order to show action in conformity therewith." Id. R. 404(b). However, evidence of
other crimes may be admitted if the evidence "has relevance apart from" this impermissible purpose. 
Montgomery, 810 S.W.2d at 387; see also Tex. R. Evid. 402 (explaining that irrelevant evidence is
not admissible). In fact, rule of evidence 404 lists several instances in which extraneous-offense
evidence may be admitted, including proving intent or the "absence of mistake or accident." Tex. R.
Evid. 404(b); see also Johnson v. State, 932 S.W.2d 296, 302 (Tex. App.--Austin 1996, pet. ref'd)
(explaining that if defendant asserts lack of intent or accident or mistake, State may offer evidence
of other crimes or acts to show intent). This type of evidence has relevance "beyond its tendency 'to
prove the character of a person to show that he acted in conformity therewith.'" Montgomery,
810 S.W.2d at 387 (quoting Tex. R. Evid. 404(b)). Accordingly, the evidence is admissible
provided that its probative value is not substantially outweighed by the danger of unfair prejudice. 
Tex. R. Evid. 403. 

 When reviewing a trial court's decision to admit extraneous-offense evidence under
rule 404, an appellate court uses an abuse-of-discretion standard. See Sells v. State, 121 S.W.3d 748,
766 (Tex. Crim. App. 2003). Under that standard, an appellate court should reverse the decision
only if it concludes that "by no reasonable perception of common experience can it be concluded that
proffered evidence has a tendency to make the existence of a fact of consequence" other than
character conformity "more or less probable than it would otherwise be." See Montgomery,
810 S.W.2d at 391; see also Tex. R. Evid. 401 (defining "[r]elevant evidence" as "evidence having
any tendency to make the existence of any fact that is of consequence more or less probable than it
would be without the evidence"). 

 During the trial, Hernandez argued that he did not have the requisite intent for the
crime alleged and that the touching that occurred was accidental in nature. (7) Further, Hernandez
asserted that N.C. misinterpreted his actions on the night in question and overreacted. Accordingly,
Hernandez has attacked the credibility of N.C.'s outcry and asserted that he did not have the requisite
intent. See Montgomery, 810 S.W.2d at 394 (explaining that because child sexual abuse crimes
"usually occur in secrecy," cases often turn upon credibility of victim). In these circumstances, the
district court could have reasonably concluded that evidence that Hernandez had previously sexually
abused girls who were approximately the same age as N.C. was relevant to Hernandez's intent
regarding his interaction with N.C. Cf. id. (explaining that evidence of prior acts of inappropriate
sexual conduct with children "may well serve to shore up testimony of the child if in logic it shows
a lascivious attitude (relevant to culpable intent)"); see Rankin v. State, 974 S.W.2d 707, 719
(Tex. Crim. App. 1998) (on reh'g) (stating that extraneous-offense evidence will generally be
relevant). The district court could also have determined that the evidence bears upon whether the
allegedly inappropriate contact was the result of an accident or a mistake. 

 In light of the preceding, we cannot conclude that the district court abused its
discretion in admitting the evidence under rule 404(b). See Montgomery, 810 S.W.2d at 390
(explaining that trial courts have leeway in deciding whether extraneous-offense evidence serves
purpose other than evidence of character); see also Rankin, 974 S.W.2d at 719 (noting that when
intent is element and cannot be proven by act itself, "evidence of other acts probative of such intent
is relevant and the trial court's decision to admit such evidence is proper"). 


 Rule 403

 Having determined that the district court did not err in admitting the evidence under
rule 404(b), we must now address Hernandez's rule 403 objection. Even when evidence of prior
criminal conduct is admissible under rule 404, the evidence may still be excluded under rule 403 if
the evidence's "probative value is substantially outweighed by the danger of unfair prejudice,
confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless
presentation of cumulative evidence." Tex. R. Evid. 403. Rule 403's scope is narrow, and courts
should only sparingly use it to justify exclusion. United States v. Fields, 483 F.3d 313, 354 (5th Cir.
2007). "Rule 403 favors admissibility of relevant evidence, and the presumption is that relevant
evidence will be more probative than prejudicial." Montgomery, 810 S.W.2d at 389; see also De La
Paz v. State, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009) (noting that rule 403 is rule of inclusion
rather than exclusion and that it only excludes evidence offered solely for purpose of proving bad
character). In other words, in close cases, "trial courts should favor admission" of the evidence. 
Montgomery, 810 S.W.2d at 389. In the balance between the probative value of evidence and the
danger that it will be unfairly prejudicial, "probativeness is the weightier consideration." Id. at 388;
see also Fields, 483 F.3d at 354 (explaining that major function of rule 403 is to exclude evidence
that has only scant or cumulative probative value). When determining whether evidence is
"unfairly" prejudicial, courts must consider its tendency to induce a decision on an improper basis,
including an emotional basis. Montgomery, 810 S.W.2d at 389. In sexual assault and abuse cases,
rule 403 "should be used sparingly to exclude relevant, otherwise admissible evidence that might
bear upon the credibility of either the defendant or complainant" because their credibility is often the
dispositive issue. Hammer v. State, No. PD-0786-08, 2009 Tex. Crim. App. LEXIS 513, at *13-14
(Tex. Crim. App. Apr. 8, 2009). 

 In deciding whether a trial court abuses its discretion by concluding that the probative
value of proffered evidence was not substantially outweighed by the factors listed in rule 403, an
appellate court "must measure the trial court's ruling against the relevant criteria by which a Rule
403 decision is to be made." Montgomery, 810 S.W.2d at 392. The relevant criteria includes the
inherent probative value of the evidence; the proponent's need for the evidence; the tendency of the
evidence to induce a decision on an improper basis; the tendency of the evidence to confuse the jury
or distract it from the main issues; the "tendency of the evidence to be given undue weight by a jury
that has not been equipped to evaluate the probative force of the evidence"; and whether the
"presentation of the evidence will consume an inordinate amount of time or merely repeat evidence
already admitted." Gigliobianco v. State, 210 S.W.3d 637, 641-42 (Tex. Crim. App. 2006); see
Erazo v. State, 144 S.W.3d 487, 489 (Tex. Crim. App. 2004). After reviewing the relevant criteria
objectively, an appellate court should conclude that the trial court abused its discretion if the record
reveals that one or more of the criteria demonstrates "a risk that the probative value of the tendered
evidence is substantially outweighed by unfair prejudice." Montgomery, 810 S.W.2d at 393. In
making its determination, an appellate court should consider that trial courts are given "an especially
high level of deference" for determining whether to exclude evidence under 403, Fields, 483 F.3d
at 354, and that a trial court's determination should be overturned only in rare circumstances and
only when there has been "'a clear abuse of discretion,'" United States v. Maggitt, 784 F.2d 590, 597
(5th Cir. 1986) (quoting United States v. Shaw, 701 F.2d 367, 386 (5th Cir. 1983)).


 Probative Value

 When determining the probative value of past criminal behavior, particularly when
the intent of the defendant is an issue, courts should consider the similarity of the prior offense to
the current offense charged and the amount of time that has passed since the prior offense was
committed. See Kiser v. State, 893 S.W.2d 277, 281 (Tex. App.--Houston [1st Dist.] 1995, pet.
ref'd); Morrow v. State, 735 S.W.2d 907, 909-12 (Tex. App.--Houston [14th Dist.] 1987, pet. ref'd).

 Regarding similarity, the victims from Hernandez's prior convictions were both
young girls about the same age as N.C. Moreover, evidence was presented at trial showing that
Hernandez was intoxicated when he committed the prior crimes and during the time in which the
allegedly improper contact at issue in this case occurred. Accordingly, as mentioned previously, the
district court could have reasonably concluded that the prior convictions were similar enough to
properly aid the jury in its determination of whether Hernandez had an improper intent when he
interacted with N.C. and whether Hernandez accidentally or mistakenly caused an improper
touching. See Johnson, 932 S.W.2d at 302 (explaining that when extraneous-offense evidence is
offered to show intent rather than identity, degree of similarity need not be as high). 

 Regarding the passage of time, the prior criminal behavior occurred thirteen years
before the trial in this case. Generally speaking, courts have found that evidence was not too remote
if the amount of time that has passed is significantly less than the amount at issue here. Compare
Robinson v. State, 701 S.W.2d 895, 898 (Tex. Crim. App. 1985) (concluding that four-to-six-month
lapse in time was sufficiently small for extraneous offense to have probative value), and Morrow,
735 S.W.2d at 911 (deciding that seven-day difference between charged crime and extraneous
offense was sufficiently close to be probative), with Plante v. State, 692 S.W.2d 487, 495
(Tex. Crim. App. 1985) (determining that 18-month gap was too large). But this Court has also
concluded that an identical gap in time did not render the evidence of prior offenses too remote. See
Corley v. State, 987 S.W.2d 615, 621 (Tex. App.--Austin 1999, no pet.) (concluding that crime that
occurred thirteen years before trial was not too remote). That case, like this one, involved a sexual
crime, and the evidence sought to be admitted was evidence that the defendant had sexually assaulted
another person 13 years earlier. Id. at 617. 


 Need for the Evidence

 The State's need for the evidence was high. See Erazo, 144 S.W.3d at 495-96
(explaining that when determining whether the proffered evidence was needed, courts should
consider whether the proponent had other evidence to establish the fact of consequence, how strong
the other evidence was, and whether the "fact of consequence related to an issue that is in dispute").
During trial, little evidence was introduced showing that Hernandez had acted "with the intent to
arouse or gratify the sexual desire of any person," and the evidence that was admitted was
contradicted by the testifying witnesses. For example, although Lillian and Officer Bryan both
testified that N.C. had made an allegation that Hernandez had improperly placed her hands in his
"private area," Officer Bryan testified that he did not actually talk with N.C. or anyone besides
Lillian, and Lillian later testified that she had called the police prior to getting all of the necessary
facts and now believed that Hernandez had not engaged in any inappropriate conduct. Similarly,
although the videotape of N.C.'s interview at the Center contains statements by N.C. that Hernandez
moved her hands to his private area, N.C. testified during the trial that she did not think that
Hernandez had done anything wrong and that the touching was accidental. (8) 


 Improper Basis

 The testimony introduced at trial demonstrated that Hernandez had, in the past,
sexually abused two children. This type of evidence is inflammatory and has the potential to be
unfairly prejudicial. See Montgomery, 810 S.W.2d at 397; see also Martin v. State, 176 S.W.3d 887,
897 (Tex. App.--Fort Worth 2005, no pet.) (explaining that sexually related misconduct and
misconduct involving children are inherently inflammatory). However, as will be more thoroughly
discussed later, the testimony regarding the prior convictions was not extensive, and the State only
briefly mentioned the prior offenses in its closing and only in reference to Hernandez's intent or to
combat the defensive theories of mistake or accident. 

 Furthermore, during his closing, Hernandez repeatedly stated that the jury could not
consider the evidence of the prior offenses for the purpose of concluding that Hernandez committed
the act alleged in this case because he had committed other bad acts in the past. In addition, the
district court's charge to the jury also stated that the jury could only consider evidence of other bad
acts only if they "find and believe beyond a reasonable doubt that the defendant participated in such
. . . acts" and only "for the purpose of determining intent, preparation, plan, or to rebut accident or
mistake, if any, and for no other purpose." 


 Undue Weight

 None of the testimony regarding Herandez's prior convictions concerned complicated
or technical subject matters. Accordingly, the district court could have reasonably concluded that
the evidence was not the type that "might mislead" a jury that is not prepared to "judge the probative
force of the evidence." Gigliobianco, 210 S.W.3d at 641. 


 Time to Present, Repetitiveness, and Potential Confusion

 Although both Nancy and J.V. testified regarding Hernandez's prior convictions,
neither one of them testified for very long. In fact, although the reporter's record in this case is
several hundred pages long, the combined testimony of Nancy and J.V. only constitutes 30 pages of
the record. Furthermore, the State only briefly mentioned the prior offenses during its closing and
only in reference to Hernandez's intent and to argue that the touching was not accidental. For this
reason, there is little likelihood that the evidence could have confused or distracted the jury from the
crime Hernandez was charged with in this case. Id. 

 Moreover, although Lillian had testified that Hernandez had been convicted of
attempted indecency with a child before Nancy and J.V. were called to testify, no evidence had been
admitted regarding the behavior that Hernandez allegedly engaged in or whether it was similar to the
misconduct he was charged with in this case. Accordingly, the evidence was not repetitive of any
other evidence that had already been introduced. Additionally, because J.V. admitted that her
memory of the event was not that clear and because Nancy and J.V. testified regarding different
aspects of the incident, their testimonies were not repetitive. 

 For all the reasons described above, we cannot conclude that the district court abused
its discretion by allowing Nancy and J.V. to testify regarding Hernandez's prior bad acts. See
Montgomery, 810 S.W.2d at 397 (concluding that probative value of evidence was outweighed by
danger of unfair prejudice when all factors weighed against admission). (9) 


Pre-sentence Investigation Report

 In addition to challenging the admissibility of the testimony of Nancy and J.V.,
Hernandez also asserts that the district court erred in admitting the pre-sentence investigation report
that was prepared after Hernandez pleaded guilty to his prior offenses. The report was admitted after
Nancy and J.V. finished giving their testimony. The report contains two types of information that
Hernandez objects to. The first type pertains to the charges made against Hernandez. Specifically,
the report contains a statement of the charges that were made against Hernandez and a brief summary
of the events that occurred. The second type concerns whether Hernandez accepted responsibility
for his prior offenses and was remorseful. Specifically, the report asked, "Was anyone hurt by this
incident?" Hernandez's recorded response to this question was "No." During the trial, Hernandez
contended that the admission of the report violated rules 404(b) and 403. Alternatively, he argued
that the evidence should not have come in because he did not open the door to testimony regarding
whether he regretted his prior misconduct. 

 Assuming without deciding that the district court erred in admitting the first type of
evidence, "[t]he erroneous admission of evidence of an extraneous offense in violation of the
evidentiary rules does not violate the state or federal constitutions." See Roethel v. State, 80 S.W.3d
276, 281 (Tex. App.--Austin 2002, no pet.). Accordingly, we must disregard the error unless it
affected Hernandez's substantial rights. See Tex. R. App. P. 44.2(b). 

 Previously we determined that evidence regarding Hernandez's prior convictions was
admissible under rule 403 and rule 404(b). The first type of evidence found in the report (summary
of criminal action) was relatively sparse, was merely cumulative of the testimony introduced
previously, did not contain any new information, and did not contain any information more
inflammatory than the testimony of Nancy or J.V. Accordingly, we conclude that any error
stemming from the admission of the first type of information was harmless. 

 Regarding the second type of information (remorse), the State sought to introduce that
evidence in response to testimony that was elicited during Hernandez's cross-examination of Nancy. 
During her cross-examination, the following exchange occurred:


[Hernandez]: Okay. Mr. Hernandez pled guilty for the charges against your daughter
and her friend. Right?


[Nancy]: That's what I was told, yes. 


[Hernandez]: So that's taking responsibility for something he did that was wrong. 
Right?


[Nancy]: Yes. 


[Hernandez]: The State of Texas convicted him, and he had a debt that he needed to
pay to society. Right? 


[Nancy]: Right. 


. . . 


[Hernandez]: If somebody pays a debt to society and they fulfill that debt. Right?


[Nancy]: Right. 



 By introducing evidence concerning his willingness to accept responsibility for his
mistakes, the district court could have reasonably concluded that Hernandez opened the door to the
information in the report concerning Hernandez's desire to accept responsibility for and his remorse
regarding his prior misconduct. See Hayden v. State, No. 0860-07, 2009 Tex. Crim. App. LEXIS
510, at *10-11 (Tex. Crim. App. April 8, 2009) (explaining that otherwise inadmissible evidence
may become admissible if party opens door to evidence). In other words, the district court could
have determined that Hernandez was attempting to show that he did not have the requisite intent in
this case because he acknowledged that his prior actions were improper and learned from his prior
mistakes. For that reason, the district court could have acted within the zone of reasonable
disagreement and concluded that evidence showing that he pleaded guilty but did not believe that
his actions were improper bears upon his intent in this case. 

 Furthermore, we also cannot conclude that the district court abused its discretion by
admitting the evidence over Hernandez's rule 403 objection. See id. at *11 (stating that even if party
opens door to certain types of evidence, rule 403 may require evidence be excluded). The portion
of the report at issue consisted of a single question and a one word ("No") answer, and the testimony
regarding this portion of the report was minimal. In fact, the questioning regarding this portion of
the report took up less than one page of the reporter's record. Also, evidence regarding Hernandez's
lack of remorse for his prior actions had not been previously introduced so this evidence was not
merely repetitive of other evidence. Further, the questioning did not concern a complicated subject
matter. Moreover, the evidence and accompanying testimony were not overly inflammatory,
particularly compared to the testimony of Nancy and J.V. In addition, the evidence related to
Hernandez's intent in this crime. As mentioned previously, the State's need for evidence pertaining
to intent was high in this case. 

 In light of the preceding and in light of the limited circumstances in which appellate
courts should reverse rule 403 determinations, we cannot conclude that the district court erred by
admitting the portion of the report concerning whether Hernandez believed his prior victims had
been harmed by his misconduct. See Gigliobianco, 210 S.W.3d at 641-42 (listing factors to consider
in rule 403 analysis). For all the reasons previously given, we cannot conclude that the district court
erred by admitting the pre-sentence investigation report into evidence. 


Videotape

 In his third issue, Hernandez also argues that the trial court erred by admitting into
evidence a videotape recording of N.C.'s interview at the Center. (10) The State offered the videotape
as a prior recorded recollection under rule of evidence 803(5). That rule provides, in relevant part,
as follows:


The following are not excluded by the hearsay rule, even though the declarant is
available as a witness:


(5) Recorded Recollection. A memorandum or record concerning a matter about
which a witness once had personal knowledge but now has insufficient recollection
to enable the witness to testify fully and accurately, shown to have been made or
adopted by the witness when the matter was fresh in the witness' memory and to
reflect the knowledge correctly, unless the circumstances of preparation cast doubt
on the document's trustworthiness. 



Tex. R. Evid. 803(5). (11) 

 In order for a party to introduce a prior recorded recollection, four elements must be
met. Johnson v. State, 967 S.W.2d 410, 416 (Tex. Crim. App. 1998). First, the witness must have
"firsthand knowledge of the event." Id. Second, the recorded recollection must be an original
recording that "was made at or near the time of the event while the witness had a clear and accurate
memory of it." Id. Third, "the witness must lack a present recollection of the event." Id. Finally,
"the witness must vouch for the accuracy of the" recording. As with the admission of evidence in
general, a trial court has discretion to admit past recorded recollections, Phea v. State, 767 S.W.2d
263, 267 (Tex.App.--Amarillo 1989, pet. ref'd), and appellate courts will not reverse the trial court's
determination absent a clear abuse of discretion, Zuliani v. State, 97 S.W.3d 589, 595 (Tex. Crim.
App. 2003). 

 Hernandez contends that it was improper to admit the videotape because N.C.
unequivocally stated during her testimony that no improper touching had occurred. However, N.C.
answered "I don't remember" to several of the State's questions regarding the incident. In particular,
N.C. was unable to recall whether Hernandez stroked her hair, whether Hernandez told her that she
needed a haircut, whether she looked up at Hernandez after he moved her hand, and whether
Hernandez's mouth was open or closed when he kissed her. N.C. also testified that she did not
remember if she talked to her mother about the incident again after initially telling her mother about
it on the night in question. 

 In addition, N.C. is one of only two individuals who have had firsthand knowledge
of the event. Moreover, N.C. testified that the video was made within two weeks of the night in
question. Furthermore, N.C. admitted that the recording was of the interview she gave at the
Center. (12) Moreover, she stated that she was telling the truth during the interview. Although N.C.
later stated that her statement in the interview indicating that she had felt Hernandez's penis was
untrue, she also admitted that her memory of the event was better when she gave the interview than
it was at the time of trial and that she remembered the event at the time of the interview. 

 In light of the preceding, we cannot conclude that the district court erred by
determining that N.C. lacked a full recollection of the event, that N.C. endorsed the accuracy of the
recording, and that the video was made near the time of the interaction with Hernandez when N.C.
had an accurate memory of the event. Johnson, 967 S.W.2d at 416; see also Wigiert v. State,
948 S.W.2d 54, 58 (Tex. App.--Fort Worth 1997, no pet.) (explaining that under rules of evidence,
whether item actually refreshes memory does not bear upon its admissibility; instead all that is
required is that statement be shown to have been made by witness when it was fresh in his mind and
to reflect knowledge at that time). 

 For all the reasons previously given, we overrule Hernandez's third issue on appeal. 


Second Issue

 In his second issue, Hernandez raises several arguments. First, he contends that the
district court erred by admitting the evidence of his prior convictions without a limiting instruction. 
Second, he argues that the district court erred by allowing the State to elicit "hearsay within hearsay"
testimony from Officer Bryan. Third, Hernandez asserts that the court erred by allowing the State
to introduce impermissible bolstering evidence through the video of N.C.'s interview at the Center. 
Fourth, he argues that the district court erred by permitting the State to call witnesses for the sole
purpose of impeaching them. Finally, he contends that the court erred by allowing a probation
officer to testify regarding the pre-sentence investigation report even though the officer did not
prepare the report. Hernandez contends that this last error violated his confrontation rights under
the constitution. 


Limiting Instruction

 As mentioned previously, Hernandez argues that the district court erred by failing to
provide a limiting instruction regarding his prior convictions. Rule of evidence 105 explains when
a party may complain on appeal about the failure to provide a limiting instruction. See Tex. R. Evid.
105. In particular, the rule provides, in relevant part, as follows:


When evidence which is admissible . . . for one purpose . . . but not . . . for another
purpose, the court, upon request, shall restrict the evidence to its proper scope and
instruct the jury accordingly; but, in the absence of such request the court's action in
admitting such evidence without limitation shall not be a ground for complaint on
appeal. 



Id. (emphases added). 

 Well before the evidence regarding Hernandez's prior convictions was admitted,
Hernandez did request that an instruction regarding the prior offenses be given. The request
occurred outside the presence of the jury and in response to the State's assertion to the district court
that it intended to offer evidence of Hernandez's prior convictions in order to rebut several of
Hernandez's defensive theories. This exchange occurred the day before the evidence of Hernandez's
prior convictions was introduced. 

 During the exchange, Hernandez asked the district court to provide a limiting
instruction explaining the purposes for which the evidence may be used. The court agreed and stated
that it would provide a limiting instruction in accordance with rule of evidence 404(b). See id. R.
404(b) (providing list of permissible uses for prior misconduct). Further, the court stated that it
would provide the instruction in the jury charge and would "give it at this time if requested." 
(Emphasis added.) Later, the court stated that it would "give the limiting instruction I have
indicated" when the State introduces evidence of prior offenses. While the State was seeking to
refresh N.C.'s recollection by playing a portion of the interview that she gave at the Center, the court
again reminded Hernandez that it would provide the limiting instruction regarding prior misconduct
provided that Hernandez specifically requested that the instruction be given. Further, the district
court remarked that Hernandez had not yet asked for the instruction. Specifically, the court stated
as follows:


I announced - I announced in open court out of the presence of the jury that you
could have a limiting instruction. Told you what it would be. You didn't ask for it
in front of the jury. I assumed that was some trial strategy on your part. If you don't
ask for it, I'm not just going to jump into the middle of a case and the flow of it
without someone requesting it. You can have it at any time. That's definitely going
to be in the jury charge. (Emphasis added.) 



After the court concluded, Hernandez replied, "Understood, Your Honor." 

 Despite receiving two reminders from the district court, Hernandez failed to request
a limiting instruction at the time that the evidence of Hernandez's prior convictions was admitted
through the testimony of J.V. and Nancy and through the pre-sentence investigation report. By
failing to request the limiting instruction at the time the evidence was offered and by failing to object
to the court's failure to give a limiting instruction, Hernandez waived this complaint for appellate
purposes. See id. R. 105; Tex. R. App. P. 33.1(a) (explaining that to preserve complaint on appeal,
generally complaint must be presented to trial court and court must either rule on request or refuse
to rule); see also Williams v. State, 273 S.W.3d 200, 230 (Tex. Crim. App. 2008) (concluding that
trial court did not err by failing to provide limiting instruction when appellant failed to request
instruction at time evidence was admitted); Arnold v. State, 234 S.W.3d 664, 673
(Tex. App.--Houston [14th Dist.] 2007, no pet) (holding that although appellant had previously
requested limiting instruction, his limiting-instruction complaint was waived because he failed to
request limiting instruction at time evidence was introduced). (13) 


Testimony of Officer Bryan

 In his second issue, Hernandez also asserts that the district court improperly allowed
Officer Bryan to testify about what N.C. told her mother (Lillian) regarding the touching initiated
by Hernandez. Specifically, Hernandez contends that because Bryan's testimony is based on
statements that N.C. made to her mother and that her mother communicated to Bryan, the testimony
constitutes hearsay within hearsay. 

 During Bryan's testimony, Hernandez made only one hearsay objection, but the
district court never ruled on the objection. The relevant exchange occurred as follows:


[State]: So after Lillian Cruz put her father to bed, what did she say about her
daughter, that she had talked to her daughter?


[Hernandez]: Objection, Your Honor, hearsay.


[The Court]: I'm sorry. Now, ask the question again.


[State]: After she put her father to bed, did she talk to her daughter?


[Bryan]: Yes.


[State]: What did her daughter tell her?


[Bryan]: She cried out that she had been improperly contacted by her grandfather.


[State]: Improperly contacted?


[Bryan]: Sexually. 


[State]: Okay. Did [Lillian] show you where the alleged sexual contact took place?


[Bryan]: Yes. 


[State]: Did you take pictures? 


[Bryan]: Yes, I did. 



 After the trial court asked the State to repeat its question, Hernandez made no attempt
to reassert his objection, ask the court for a ruling, or complain that the court had refused to rule on
his objection. See Tex. R. App. P. 33.1(a) (explaining that to preserve issue for appeal, trial court
must rule on objection "either expressly or implicitly" or must "refuse to rule on . . . objection . . .
and the complaining party objected to the refusal"). Moreover, some time after this exchange, the
State again asked Bryan what Lillian told him on the evening in question, and Bryan again stated that
Lillian told him that N.C. told her that Hernandez had improperly touched her. Hernandez did not
object to this testimony. See Rogers v. State, 853 S.W.2d 29, 35 (Tex. Crim. App. 1993) (stating
general rule "that error regarding improperly admitted evidence is waived if that same evidence is
brought in later by the defendant or by the State without objection").

 In light of the preceding, we conclude that Hernandez has waived this complaint
on appeal. 


Video of N.C.'s Interview

 As mentioned previously, Hernandez contends that the district court erred by allowing
the State to play the recording of N.C.'s interview because the video constituted impermissible
bolstering. Bolstering occurs when evidence is admitted for the sole purpose of convincing the
factfinder that a "particular witness or source of evidence is worthy of credit, without substantively"
making the existence of a fact of consequence more or less probable than it would have been without 
the evidence. See Cohn v. State, 849 S.W.2d 817, 819-20 (Tex. Crim. App. 1993); see also
Rivas v. State, 275 S.W.3d 880, 886 (Tex. Crim. App. 2009) (explaining that "bolstering" objections
are inherently ambiguous because law concerning bolstering predates promulgation of rules of
evidence and implicates several evidentiary rules). 

 Although Hernandez did not specifically identify during trial what statements in the
video were improper or what the statements bolstered, in the interests of justice we will construe his
argument as asserting that N.C.'s statements in the video improperly bolstered her testimony given
during trial. (14) Cf. Rivas, 275 S.W.3d at 885 (explaining that party has the burden of explaining
"'why or on what basis the otherwise admissible evidence should be excluded'" as impermissible
bolstering (quoting Cohn, 849 S.W.2d at 21 (Campbell, J., concurring))). 

 The video contains several types of statements that relate to N.C.'s trial testimony. 
First, the tape contains information regarding the events leading up to the allegedly improper
touching that were not disputed by Hernandez. For example, in the video, N.C. stated that when she
hugged her grandfather, she put her hand on her grandfather's side and that Hernandez moved it
down. In addition, N.C. also stated during the interview that her grandfather was very drunk on that
evening and indicated that he was unstable on his feet. N.C. repeated these assertions during her
testimony at trial. Because this information does not bear upon any of the elements of the offense
charged and was not disputed by Hernandez during trial, we believe that if the district court erred
by admitting this type of information, the error was harmless. See Ivey v. State, 250 S.W.3d 121, 126
(Tex. App.--Austin 2007) (explaining that erroneous admission of evidence is not constitutional
error), aff'd, 277 S.W.3d 43 (Tex. Crim. App. 2009); see Tex. R. App. P. 44.2 (stating that
nonconstitutional errors must be disregarded unless they affect party's substantial rights). 

 The second type of information bears upon the elements of the charged offense and
is consistent with N.C.'s testimony at trial that no improper touching occurred. For example, in the
video, N.C. communicated that when Hernandez moved her hand to his lap, she did not feel anything
and that she did not feel anything hard or soft. These assertions were repeated by N.C. during her
testimony at trial. Specifically, N.C. stated that although Hernandez moved her hand to "somewhere
by his private parts" or "[o]n his private parts" or "private area," she did not feel Hernandez's
"private parts." N.C. also testified that she believed that the inappropriate touching was accidental
in nature. N.C.'s statements in the video that she did not feel "anything" actually benefitted
Hernandez because they support Hernandez's defense that he had no improper intent when he moved
N.C.'s hand. Accordingly, the admission of this type of evidence did not harm Hernandez. 

 The final type of information contained in the video are statements that bear upon the
elements charged and that directly contradict N.C.'s testimony at trial. For example, in the video,
when Williams asked where Hernandez moved her hand to, N.C. pointed to an area on a male
drawing that she had referred to as the "private parts." Later, N.C. stated that Hernandez grabbed
her hand, moved it down to the "private parts," and then patted her hand. In response to a question
by Williams, N.C. said that she felt Hernandez's private parts. As mentioned previously, during the
trial, N.C. denied that she felt Hernandez's private parts and also stated that Hernandez did not pat
her hand. Because the information in the video contradicts N.C.'s testimony, it cannot constitute
impermissible bolstering. 

 For all the reasons previously discussed, we cannot conclude that the district court
erred by failing to conclude that the video of N.C.'s interview should not be admitted because it
constituted impermissible bolstering. 


Impeachment

 In his second issue, Hernandez contends that the district court erred by allowing the
State to call N.C. and Lillian to the stand for the sole purpose of admitting "otherwise inadmissible"
impeachment evidence. See White v. State, 201 S.W.3d 233, 245 (Tex. App.--Fort Worth 2006, pet.
ref'd) (explaining that "right to impeach one's own witness does not, however, permit a party to call
a witness primarily for the purpose of impeaching the witness with otherwise inadmissible hearsay
testimony"). Although it is not entirely clear from the briefs, Hernandez appears to be contending
that the State was aware that the testimony of N.C. and Lillian would not be favorable to the State
but called them for the purpose of admitting into evidence the video of N.C.'s interview and the
evidence of Hernandez's prior offenses. 

 As a preliminary matter, we note that we have been unable to find in the record any
objection to the testimony of N.C. or Lillian that comports with this issue on appeal. Cf. Ruth v.
State, 167 S.W.3d 560, 565 (Tex. App.--Houston [14th Dist.] 2005, pet. ref'd) (noting that during
trial appellant objected that State was calling witness for sole purpose of impeaching her with
inadmissible evidence); see also Cook v. State, 858 S.W.2d 467, 474 (Tex. Crim. App. 1993)
(explaining that "[w]hen the complaint on appeal differs from that made at trial, the error is waived"
because there is nothing to review on appeal). Accordingly, this issue was waived for
appellate purposes. 

 Even assuming that Hernandez had preserved the issue for appeal, we would still be
unable to conclude that the district court abused its discretion by allowing the State to call N.C. and
Lillian to the stand. Rule of evidence 607 allows "any party, including the party calling the witness,"
to attack "[t]he credibility of a witness." Tex. R. Evid. 607. This rule abandoned the "voucher rule,"
"which prohibited a party from impeaching its own witness." Hughes v. State, 4 S.W.3d 1, 5 (Tex.
Crim. App. 1999). Similarly, the rule does not require that the offering party be surprised by its
witness's testimony before being allowed to impeach the witness. Id. Rather, the party's
"knowledge that its own witness will testify unfavorably is a factor the trial court must consider
when determining whether the evidence is admissible under Rule 403." Id. In other words, the
party's knowledge should be considered when determining if the impeachment evidence should be
excluded because its probative value is substantially outweighed by its prejudicial effect. Id.; see
Tex. R. Evid. 403. 

 Contrary to Hernandez's assertions, the evidence of his prior offenses was not offered
to impeach Lillian. Instead, the evidence was offered to show that Hernandez had an improper intent
when the allegedly improper touching occurred and to rebut the defensive theories of accident or
mistake. Moreover, we previously determined that the district court did not abuse its discretion by
admitting the evidence and by overruling Hernandez's rule 403 objection. Accordingly, we would
be unable to conclude that the court erred by failing to conclude that the State called Lillian to the
stand for the purpose of admitting otherwise inadmissible evidence of his prior convictions. 

 Similarly, we would be unable to conclude that the district court erred by allowing
N.C. to testify. N.C. was called to the stand as a witness to the allegedly improper conduct by
Hernandez. In fact, N.C. was the only witness to his behavior. Accordingly, her testimony and the
statements she made at the Center had high probative value. 

 Moreover, as discussed previously, the video was offered during the testimony of
N.C. after she communicated that she did not know the answer to several of the State's questions,
and we determined that the district court did not abuse its discretion by concluding that the tape
could be played as a prior recorded recollection, a hearsay exception. See Tex. R. Evid. 803(5). In
other words, the evidence was not otherwise inadmissible, and we, therefore, would be unable to
conclude that the district court erred by failing to conclude that the State called N.C. for the purpose
of admitting otherwise inadmissible evidence. See White, 201 S.W.3d at 246 (concluding that
district court did not abuse its discretion by admitting statements because they were admissible under
exception to hearsay and, therefore, purpose of calling witness was not solely to introduce otherwise
inadmissible hearsay).

 Even assuming that the video was not admissible as a prior recorded recollection, we
would still be unable to conclude that district court erred. As discussed previously, both N.C.'s
testimony and the video had high probative value. In addition, nothing in the record supports a
determination that the State was aware before N.C. testified that she no longer had full recall of the
incident in question and no longer believed that anything inappropriate had occurred. See Ruth,
167 S.W.3d at 566 (explaining that State must know "in advance" that witness will recant). In fact,
Lillian's testimony revealed that despite repeated requests by the State before trial, she refused on
several occasions to allow the State to talk with N.C. In other words, the State could not have
determined what N.C.'s testimony was going to be. Further, although Lillian wrote a letter to the
district attorney's office stating that she no longer felt that anything improper had occurred between
Hernandez and N.C., the letter did not communicate that N.C. no longer remembered the incident,
did not detail what either Lillian or N.C. would testify to if called by the State, and did not state that
N.C. did not feel Hernandez's "private parts" on the night in question. Even assuming that an
informal letter like the one written by Lillian could justify imputing knowledge to the State, see
Barley v. State, 906 S.W.2d 27, 37 n.11 (Tex. Crim. App. 1995) (noting that State may be charged
with knowledge that witness will recant when witness already recanted statement in "prior sworn
testimony"), the assertions in that letter would not seem to be sufficient to charge the State with
knowledge that N.C. would testify unfavorably towards the State. Accordingly, given the highly
probative nature of the video and the lack of evidence demonstrating that the State was aware that
N.C. would not testify in its favor, we would be unable to determine that the district court erred by
failing to conclude that the State called N.C. to the stand for the sole purpose of admitting otherwise
inadmissible evidence. 

 For all these reasons, we would be unable to conclude that the district court erred by
allowing the State to elicit testimony from N.C. and Lillian because the record does not support a
determination that the State asked either witness to testify for the sole purpose of admitting otherwise
inadmissible impeachment evidence. Hughes, 4 S.W.3d at 5; see Ruth, 167 S.W.3d at 566
(concluding that district court did not abuse its discretion by admitting statement because record
supports determination that witness was not called solely for impeachment purposes). 


Probation Officer's Testimony

 As mentioned previously, the pre-sentence investigation report from Hernandez's
prior convictions was admitted into evidence. The report was admitted during the testimony of a
probation officer, Randy Graef. Graef was not the probation officer who prepared Hernandez's
report, but he was called to the stand to provide general testimony regarding the preparation of pre-sentence investigation reports. 

 Graef then testified regarding the pre-sentence investigation report that was prepared
when Hernandez pleaded guilty to the prior offenses. According to Graef, the report was prepared
after a probation officer interviewed Hernandez about the offenses. The report contains a summary
of the offenses and a statement indicating that Hernandez felt that no one was hurt as a result of his
actions. Regarding that statement, the State asked Graef if, in his opinion as a probation officer,
Hernadez's "statement accepts responsibility for [his prior] actions?" Graef responded, "In my
opinion, the defendant did not accept responsibility for his actions in the probated offenses." 

 In light of the preceding testimony, Hernandez contends that the district court erred
by allowing the report to come in because it contains the conclusions of the probation officer who
prepared the report but did not testify at trial and by allowing Graef "to testify to the conclusions of
the probation officer" who prepared the report. Further, Hernandez argues that admitting this
evidence violated his "constitutional right to confront the witnesses against him" and that the right
to confrontation mandated that he be given the option to confront the probation officer who prepared
the pre-sentence investigation report regarding "the conclusions he included in" the pre-sentence
investigation report. 

 However, Hernandez made no confrontation objection to the testimony of Graef or
to the district court's decision to admit the report. Instead, Hernandez objected to the admission
under rules of evidence 404(b) and 403, stated that the evidence was impermissible bolstering, and
argued that Graef's testimony regarding the conclusions in the report exceeded the scope of the
permissible testimony that Graef was called to provide. For this reason, we must conclude that
Hernandez failed to preserve this issue for appeal. See Tex. R. App. P. 33.1; see also Melendez-Diaz
v. Massachusetts, 129 S. Ct. 2527, 2534 n.3 (2009) (explaining that "right to confrontation may . . .
be waived, including by failure to object to offending evidence"); Deener v. State, 214 S.W.3d 522,
527 (Tex. App.--Dallas 2006, pet. ref'd) (stating that "right of confrontation is a forfeitable right
. . . and must be preserved by a timely and specific objection at trial"). 

 In light of the preceding, we overrule Hernandez's second issue on appeal. 


First Issue

 In his first issue, Hernandez argues that the district court "was biased against [him]
and his lead counsel, their witnesses and their evidence, to the extent that the constitutionally
required fair trial was denied." See U.S. Const. amend. VI (governing rights of accused in criminal
trials); Tex. Const. art. I, § 10 (same). In making his assertion that the district court was biased
against him, Hernandez points to various rulings made by the district court, to the decision by the
district court to call the Department of Family and Protective Services (the "Department") to ask for
an employee to sit with N.C. during the trial, to various comments made by the district court during
the trial, and to a hearing called by the district court for the purpose of determining whether
Hernandez's attorney should be held in contempt. 

 As a preliminary matter, we note that the term "bias" does not include "all
unfavorable rulings toward an individual," Abdygapparova v. State, 243 S.W.3d 191, 198
(Tex. App.--San Antonio 2007, pet. ref'd); rather, the term only refers to a "favorable or
unfavorable disposition or opinion that is somehow wrongful or inappropriate, either because it is
undeserved, or because it rests upon knowledge that the subject ought not to possess . . . , or because
it is excessive in degree," Liteky v. United States, 510 U.S. 540, 550 (1994). In order for the alleged
bias to have denied a party due process, the party must demonstrate a "deep-seated favoritism or
antagonism that would make fair judgment impossible." Id. at 555; see also Kemp v. State,
846 S.W.2d 289, 305-06 (Tex. Crim. App. 1992) (explaining that bias must be of such degree as to
deny party "due process of law"). When reviewing whether impermissible bias was present,
appellate courts must bear in mind that courts enjoy a presumption of judicial impartiality. See
Abdygapparova, 243 S.W.3d at 198. 

Prior Rulings

 In making his bias assertion, Hernandez incorporates all of the alleged errors
discussed above and concludes that the district court's rulings and admission of the evidence
described above demonstrates the district court's hostility towards him. However, given that we
have overruled all of the issues and subissues described above because we concluded that the district
court did not abuse its discretion by admitting the evidence that Hernandez disputed, because
Hernandez failed to preserve the alleged errors for appeal, or because the alleged errors were
harmless, we cannot conclude that the district court's rulings demonstrated the type of bias that could
have deprived Hernandez of his right to a fair trial. (15) See Liteky, 510 U.S. at 555 (noting that
"judicial rulings alone almost never constitute" improper bias and only in "rarest circumstances" can
show type of favoritism necessary to show bias; disagreement with rulings is more properly raised
as issue on appeal rather than as assertion of bias). 


Court Monitor

 In addition to the errors previously alleged, Hernandez argues that the district court
demonstrated its bias by threatening to remove N.C. from her parents' custody during the trial. The
event Hernandez is referring to occurred during a break in N.C.'s testimony in which the jury was
excused. The State informed the district court that during the break, N.C.'s parents communicated
that they were unhappy with the manner in which the State had questioned N.C. Further, the State
relayed that N.C.'s father had said that the State's questioning was harassing and "nonsense." In
light of the parents' comments, the State informed the court that it was concerned that "the rule [was]
not being adhered to." For that reason, the district court asked that the Department of Family and
Protective Services (the "Department") be informed about the situation so that one of its employees
could sit with N.C. during the trial. 

 Hernandez argues that the district court's decision to call the Department and to
remove N.C. from her parents' custody demonstrated the district court's hostility towards his case. 
As a preliminary matter, we note that the district court's actions were not directed toward Hernandez
but toward N.C.'s parents. Accordingly, it is unclear how the district court's behavior could have
demonstrated any bias against Hernandez. 

 Regardless, in light of the State's assertions that the parents were upset by statements
N.C. made during her testimony, the district court could reasonably have been concerned that the rule
prohibiting witnesses from discussing their testimony with one another was not being adhered to. 
Moreover, the district court could have reasonably concluded that it might be necessary to have an
employee from the Department monitor N.C.'s interaction with her parents to ensure that no
improper communications were made. Importantly, although the district court originally asked for
a Department employee to monitor the situation, the court changed its mind after N.C. finished her
testimony shortly after the break was over. 

 In light of the preceding, we cannot conclude that the district court's decision to
inform the Department and ask for a monitor demonstrated undue bias against Hernandez. 


Comments by the District Court

 In his first issue, Hernandez also argues that various comments made by the district
court evidence its bias against him. (16) When reviewing allegations of bias, we must bear in mind that 
trial courts are given broad discretion to express themselves and their opinions, including opinions
that may be "critical, disapproving, and even hostile toward" a party or his attorney. 
Abdygapparova, 243 S.W.3d at 199. "[E]xpressions of impatience, dissatisfaction, annoyance, and
even anger, that are within the bounds of what imperfect men and women . . . sometimes display"
do not establish bias on behalf of a trial court. Liteky, 510 U.S. at 555-56. A judge's comments
regarding courtroom administration, even if the comments are stern, "remain immune." Id. at 556. 
Moreover, "a trial judge's irritation at the defense attorney does not translate to an indication as to
the judge's views about the defendant's guilt or innocence." Jasper v. State, 61 S.W.3d 413, 421
(Tex. Crim. App. 2001). However, a judge's comments that taint the presumption of innocence
undermine the right to a fair trial and can demonstrate fundamental error. Blue v. State, 41 S.W.3d
129, 132 (Tex. Crim. App. 2000). 

 In this issue, Hernandez refers to an exchange that occurred after the State asked to
treat Lillian as a hostile witness. The exchange occurred as follows:


[The State]: Judge, I'm going to ask permission to lead. She's a hostile witness.


[The Court]: You -- there's no -- yeah, you can do that, absolutely. 


[Hernandez]: Note my objection. Your Honor. I don't see anything that shows that
she's a hostile witness.


[The Court]: Have you been here in the last ten minutes?


[Hernandez]: I have.


[The Court]: You're overruled.


[Hernandez]: May I approach the bench?


[The Court]: Sure.


[The Bailiff]: Cut your mike off, please.


(Bench conference on the record)


[Hernandez]: Your Honor, I'm going to object at this time to the Court's side-bar
remarks. And I would ask the Court to refrain to make those kind of comments in
front of the jury. If the Court has something to say that's negative about me, I'd ask
that the Court bring me up or take me out and you can chastise me.


[The Court]: I'll be happy to do that.


[Hernandez]: Thank you, Judge. We'd ask the George to -- the Court to instruct -- 


[The Court]: That's denied.


[Hernandez]: -- well, the jury to disregard the comment that you made.


[The Court]: That's denied.


[Hernandez]: Thank you, Judge.


(End of bench conference). 



 Hernandez also refers to a subsequent exchange that occurred when the State asked
for permission to play the video of N.C.'s interview for the jury. In response to the State's request,
Hernandez raised four objections to the admission of the evidence, including an objecting referring
to a previous objection that he made regarding the admission of evidence concerning Hernandez's
prior convictions. Regarding the last objection, Hernandez stated that he would "prefer not to go
into that in front of the jury at this time." After that statement was made, the following
exchange occurred:


[The Court]: Under the rules, you don't have to, but you can do whatever you want
to.


[Hernandez]: We'd ask the jury be excluded at this time.


[The Court]: No. You've already made your objection out of their presence. I've
already ruled on it. You can't have them taken out of here every five minutes so you
can make the same objection again, Counsel. 


[Hernandez]: Well, that's not correct, Your Honor. I objected when they were
outside, and you told me -- 


[The Court]: That's called a 104 hearing, and your objections there preserve any
[error] you have, Counsel. I can't -- I'm not going to educate you on the law. I'm
just telling you, you don't get to have the jury removed.


[Hernandez]: You know what, Judge, you don't need to educate me on the law. I
think I know it very well. All right. You really don't. And I object to your side-bar
remarks.


[The Court]: Well, Counsel, I've had to tell you the same thing ten times. I'm getting
tired of it. 


[Hernandez]: Well, we -- 


[The Court]: You make a ruling out of the presence of the jury on a 104 hearing. 
Your objections are preserved for all purposes at that hearing. You don't need to
have the jury removed again so you can make another 104 objection. 



 Neither of the allegedly improper exchanges above were directed at Hernandez or
bore upon his presumption of innocence. See Jasper, 61 S.W.3d at 421. Rather, the allegedly
improper statements were all directly aimed at Hernandez's attorney. We note that while a "judge
is necessarily allowed discretion in expressing himself while controlling trial of a case, . . . . a trial
judge should avoid verbal controversies with counsel in the presence of the jury and should not
express or display personal attitudes of displeasure toward counsel." Food Source, Inc. v. Zurich
Ins. Co., 751 S.W.2d 596, 600 (Tex. App.--Dallas 1988, writ denied); see Pitre v. State,
No. 09-95-140-CR, 1997 Tex. App. LEXIS 3883, at *8 (Tex. App.--Beaumont July 23, 1997, no
pet.) (mem. op., not designated for publication). Although the statements undoubtedly reveal the
district court's frustration with Hernandez's counsel, none of the statements go beyond the bounds
of expressions of dissatisfaction that imperfect people can sometimes express. See Liteky, 510 U.S.
at 555-56. Moreover, the second exchange concerned courtroom administration, which typically
cannot establish improper bias against a party. Id. at 556. Furthermore, although Hernandez
requested a limiting instruction regarding the first exchange, he did not make the same request
regarding the second exchange. Finally, we note that although the district court initially denied
Hernandez's request for a limiting instruction regarding the first exchange, the court later provided
the requested instruction by telling the jury the following:


The defense made an objection and asked to approach. And I made a comment to the
effect, "have you been here the last ten minutes?"


To the extent that that may have been construed by you as a comment upon the
credibility of this witness or the weight to be given her testimony, please disregard
it for all purposes. It was not intended for me to indicate that I think the witness was
truthful, untruthful, has great credibility, lacks great credibility, nothing of that
nature. That's totally not my job. That's not my province.


So if my remarks at this time gave you some indication that I either did or did not
believe this witness, it was not intended to. And it wouldn't matter. It wouldn't
matter what I believe one way or the other. That witness' credibility and the weight
to be given her testimony is strictly within your province and no one else's. 



 In light of the preceding, we cannot conclude that these exchanges, either separately
or collectively, demonstrate the type of impermissible bias that could violate an individual's right
to a fair trial. 


Contempt Hearing

 In his final argument on appeal, Hernandez contends that the district court showed
its bias by threatening to hold him in contempt. In making this assertion, Hernandez refers to an
exchange that occurred outside the presence of the jury regarding a comment the court bailiff heard
Hernandez's attorney make after the court made a ruling adverse to Hernandez. Although the bailiff
admitted that he did not hear who the comment was directed at, he stated that he heard Hernandez
say, "full of bullshit." 

 Although the district court did ask for some clarification regarding the comment, we
can find nothing in that exchange that revealed improper bias. When questioned about the statement,
Hernandez's attorney admitted that he made a similar statement but that the statement "wasn't
directed against the Court." Instead, the attorney communicated that the statement "was more
directed against the district attorney's office, and specifically to a certain district attorney who I'm
accustomed to say things like that, and he says them back to me." After hearing the explanation, the
district court responded, "Okay. No problem. I just wanted to be sure." The district court did not
hold the attorney in contempt, and the statement was not mentioned again. 

 For the reasons previously given, we overrule Hernandez's first issue on appeal. 


CONCLUSION

 Having overruled all of Hernandez's issues on appeal, we affirm the judgment of the
district court. 


 

 David Puryear, Justice

Before Justices Patterson, Puryear and Henson

Affirmed

Filed: February 5, 2010

Do Not Publish
1. Officer Bryan admitted that he did not question any of the individuals, including N.C., who
had been in the house at the time of the allegedly improper contact. 
2. In her testimony, Lillian also stated that although Hernandez was her father, she would not
give testimony in favor of Hernandez if she believed that he had improperly touched N.C. In fact,
Lillian stated that N.C. is her priority, that she stands behind N.C., and that she would not lie to
protect her father if he had done anything to hurt N.C. Moreover, Lillian testified that she has always
encouraged N.C. to tell the truth in this matter and has not pressured her daughter to change
her story. 
3. Like Lillian, Eric insisted that he had not pressured N.C. to change her story. In addition,
although Eric testified that he believed that the touching that occurred was not improper, he also
stated that he would be asking for Hernandez to be punished if he actually believed that Hernandez
had done anything wrong. 
4. During the questioning, the video that had originally been played to refresh N.C.'s memory
was played for the jury. 
5. In response to Hernandez's comment about his right to cross-examine witnesses, the court
also stated that Hernandez was free to question Williams as well. It is worth noting that when
Williams was called to the stand, Hernandez did not ask her whether she had improperly pressured
N.C. to give false answers. 
6. During the trial, the district court stated as follows:


I think 404(b) is right on point. It makes it admissible. . . . I think absence of
mistake or accident is the issue here. [A]nd the . . . balancing test weighs in favor of
the State. 
7. We note that on appeal, Hernandez contends that he did not argue that the touching was
accidental and instead admitted that the touching occurred but contended that he did not have the
intent to "sexually gratify" himself when he touched N.C. Although the record shows that
Hernandez did argue that the intent element was not met, the record also demonstrates that
Hernandez put forth the defensive theory of accident or mistake. For instance, when questioning
N.C., Hernandez asked her if she thought Hernandez's actions were accidental in nature. 
8. On appeal, Hernandez argues that there was no need for Nancy and J.V. to testify because
prior to them testifying, the State had asked Lillian about the fact that Hernandez had been convicted
of a attempted indecency with a child. Although Lillian's testimony revealed that two girls were
involved in the incident, no other details regarding Hernandez's misconduct were revealed. 
Accordingly, Lillian's testimony did not reveal the similarity between the crime Hernandez was
charged with in this case and the crimes he previously pleaded guilty to. For this reason and in light
of the State's need for evidence bearing upon Hernandez's intent, we cannot conclude that the
district court erred by allowing Nancy and J.V. to testify. Cf. United States v. Fields, 483 F.3d 313,
356 (5th Cir. 2007) (warning against using 403 to second guess admissibility determinations by
concluding that other evidence could have been used rather than disputed evidence). 
9. In his brief, Hernandez contends that the evidence of his prior crimes was improperly
admitted as impeachment evidence. As support for this assertion, Hernandez points to rule 609(a),
which concerns when evidence of a witness's prior convictions may be admitted for the purpose of
attacking the witness's credibility. See Tex. R. Evid. 609(a). However, Hernandez did not testify
during the trial and was, therefore, not a witness at the trial. See, e.g., Theus v. State, 845 S.W.2d
874, 879 (Tex. Crim. App. 1993) (analyzing whether trial court erred in admitting defendant's prior
convictions for purpose of impeaching his testimony under rule 609). 
10. Two videos were admitted at trial. The first was a condensed version of the interview. 
The second was a recording of the full interview, which was admitted in response to Hernandez's
suggestion that it should be admitted under the rule of optional completeness. During the trial,
Williams stated that she had compared both videos and that none of the questions or answers
contained in the shortened video had been altered in any way. 
11. We note that the rule also states, "If admitted, the memorandum or record may be read into
evidence but may not itself be received as an exhibit unless offered by an adverse party." Tex. R.
Evid. 803(5). In making his arguments on appeal, Hernandez does not contend that the district court
should have only allowed the videotape to be played for the jury but should not have admitted it as
an exhibit. Instead, Hernandez argues that rule 803 does not allow the use of this type of evidence
at all. 
12. We note that Williams also testified that the video was a true and accurate recording of
the interview. 
13. As mentioned previously, a limiting instruction was given in the jury charge. 
14. In this subissue, Hernandez also mentions the testimony of Williams (the interviewer at
the Center) when asserting that impermissible bolstering evidence was admitted during trial. We
note that during the trial, Williams was only called to the stand to authenticate the videotape of the
interview and that this testimony occurred outside the presence of the jury. 
15. In his brief, Hernandez asserts that the district court offered "up theories of admission for
evidence that had not been previously proffered by the State" and, in effect, acted as an advocate for
the State. In a footnote, Hernandez asserts that the district court informed the State that it could
admit the video as a prior inconsistent statement even though the State had indicated it wanted to use
the video as a prior recollection recorded. Although it is not entirely clear from his brief, we believe
Hernandez is referring to an exchange between the district court and the State in which the State said
it would like to play the tape to refresh N.C.'s memory. The court then asked, "And there are prior
inconsistent statements on that tape," and the State answered that the tape was a "prior recollection
recorded." We are not persuaded that by asking whether the video had inconsistent statements, the
district court was impermissibly acting as an advocate for the State. 


 When making this assertion, Hernandez actually refers to a different part of the record than
the portion described above. The referenced page only contains a request by Hernandez in which
he asked the district court for permission to question N.C. outside the presence of the jury. Nothing
in the exchange suggests that the court or any party was attempting to offer evidence under any
theory. 


 It is possible that Hernandez intended to refer to a portion of the record near the referenced
page in which the State offered the video of N.C. under rule of evidence 803(5), which governs the
use of prior recorded recollections. See Tex. R. Evid. 803(5). The court confirmed that the State
was seeking to admit the video under rule 803(5) but then later asked, "you're going to offer this
under 805?" After the court mentioned rule 805, the State commented, "You stated Rule 805. It's
803(5)." The court responded, "803(5). I apologize. Yes. . . . 805 has got nothing to do with it." 
Assuming that this is one of the acts Hernandez believes was improper, we can find nothing in this
exchange that indicates that the district court was improperly acting as an advocate for the State. 
Rather, the record indicates that the district court's statement was an inadvertent mistake, which was
quickly corrected. Moreover, we note that rule 805 does not provide a mechanism for the admission
of evidence; instead, it simply states that hearsay within hearsay will not be excluded as "hearsay"
provided that "each part of the combined statements conforms with a" hearsay exception. Id. R. 805. 
16. We note that rather than identify the specific statements that he alleges demonstrate bias
in his argument section, Hernandez incorporates over 20 pages of facts into his first issue and then
asserts in his argument section that the district court made improper comments. In the interests of
justice, we have attempted to identify the allegedly improper statements from the fact section of
Hernandez's brief.