**John Martin WIGIERT, Appellant,**

v.

**The STATE of Texas, State.**

**No. 2–96–108–CR.**

Court of Appeals of Texas,
Fort Worth.

June 19, 1997.

Richard S. Podgorski, Denton, for Appellant.

Bruce Isaacks, Criminal District Attorney, Dawn A. Moore, Michael Moore, George Leal, Assistant District Attorneys, Denton, Matthew Paul, State Prosecuting Attorney, Austin, for State.

Before DAY, BRIGHAM and HOLMAN, JJ.

## OPINION

DAY, Justice.

A jury found appellant John Martin Wigiert guilty of false imprisonment and sentenced him to 31 days in the Denton County Jail and a $500 fine. He appeals and raises five points of error. He first complains that the trial court erred by admitting evidence of an uncharged extraneous offense, contending that it was not relevant to a material issue other than character and its probative value was outweighed by its prejudicial effect. Next, he argues that the trial court erred by admitting hearsay testimony of an extraneous offense because the State used it as evidence of the offense charged and no issue relating to the extraneous offense was before the jury. In points of error three and four, Wigiert asserts that the trial court erred in two instances by permitting a State's witness to read to the jury part of a prior statement given to police. He argues that the prior statement was inadmissible hearsay evidence that is not encompassed by the recorded recollection hearsay exception. Finally, he complains that the trial court erred by allowing the State to impermissibly bolster the complainant's unimpeached testimony. We affirm the judgment of the trial court.

### BACKGROUND

The complainant Joy Sneed testified that Wigiert falsely imprisoned her. She testified that in response to a message on her answering machine, she telephoned Valerie Moreno, a friend of hers and Wigiert's. Wigiert answered and pretended to be talking to Moreno and another friend, Jaylene. He told Sneed that Moreno and Jaylene wanted her to come over and talk with them. Sneed then went to Moreno's apartment. Wigiert answered the door and let her in. After entering the apartment and looking around, she realized that Moreno and Jaylene were not there.

Sneed further testified that she tried to leave, but Wigiert would not let her get by him to the door. He shoved her against the wall and poked her on the shoulder with his fingertips. He also pushed her backwards, causing her hip to hit a doorknob. Sneed finally maneuvered her way to the door and discovered the doorknob and dead bolt were locked. As she tried to unlock the door, Wigiert pushed himself between her and the door and repeatedly pushed her hands away from the lock. He then pinned her up against the door and threatened her. She testified that he told her: "Don't come around here;" "Don't mess with my friends;" "If you come over here, I'm gonna to kill you;" "I'll destroy your car;" and "You'll never be able to go back to school."

Sneed then testified that she managed to pick up a shovel leaning against a coffee table. She swung it at Wigiert, but he grabbed it away and shoved her with it, striking her in the ribs with the handle. She eventually managed to escape and ran to a police officer she saw on the street in front of the apartment complex. She told the officer what had happened and he returned with her to the apartment. Wigiert would not answer the door. They left, and she later gave the police a written statement.

Moreno also testified, but stated that she could not remember anything about her contact with Wigiert on that day. However, she had given police a statement near the date of the offense. She testified that she remembered making the statement, that it was written in her handwriting, and that she had signed it before a witness. She then read parts of the statement to the jury.

[STATE'S ATTORNEY:] Ms. Moreno, I would ask that you only read this first paragraph right here to the jury. Please do not read anything else below this.

[MORENO:] Okay. "On Saturday, October 12th, I confronted John Wigiert about [Sneed]. He told me that he made her believe that Jaylene and myself were in the apartment E-9 on Hickory Street, Alton House Apartments. He said he got her over there and locked the door behind her and started to harass her. He said all this and stood there smiling. He told me that he set it up."

. . . .

Q. If you could just read about the—
A. "Joy did call the night of the 12th, because we had plans. Otherwise, she wouldn't have called."

Daniel Conrad, the police officer that Sneed approached when she escaped from the apartment, testified that he was conducting a traffic stop when Sneed ran up to him crying and upset. Sneed told him that she had been "assaulted." He went with her to the apartment, but Wigiert would not answer the door. Conrad testified that he could tell that someone was at home. He stated that he reported the offense as an assault and that he did not include any facts in his report

that made him believe it was a false imprisonment report. He further stated that based on all the facts that Sneed had told him, he believed Wigiert's actions would also constitute the offense of false imprisonment by physical force.

Guy Williamson, the police officer to whom the case was assigned, testified that he contacted Sneed and Moreno and took their statements. He further testified that he filed a probable cause affidavit on the offense of assault, but he believed the facts would also constitute probable cause for false imprisonment.

## STANDARD OF REVIEW

All Wigiert's points of error challenge evidentiary rulings by the trial court. As an appellate court, we review the trial court's decision to admit or exclude evidence under an abuse of discretion standard. *See Green v. State,* 934 S.W.2d 92, 102 (Tex.Crim.App. 1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1561, 137 L.Ed.2d 707 (1997). Such issues are largely dependent on the individual judge's perception of common experience, and reasonable persons may often disagree. *See Montgomery v. State,* 810 S.W.2d 372, 391 (Tex.Crim.App.1991) (op. on reh'g). Thus, reviewing courts should hesitate to substitute their own perceptions for those of the trial judge. *See id.* Therefore, provided a trial court ruling is "at least within the zone of reasonable disagreement, the appellate court will not intercede." *Id.*

## NON-EXTRANEOUS OFFENSE

■ In his first point of error, Wigiert complains that the trial court erred by admitting evidence of "assault" during his prosecution for false imprisonment. He contends the evidence was not relevant to a material issue other than character and its probative value was outweighed by its prejudicial effect. Thus, it was inadmissible under Texas Rule of Criminal Evidence 404(b). Wigiert complains specifically about Conrad's testimony that Sneed approached him and told him about Wigiert's assaulting her with a shovel and Sneed's testimony that Wigiert threatened to harm her.

However, viewing the evidence in the light most favorable to the trial court's ruling, it is reasonable to conclude that the "assault" occurred in the same transaction as the false imprisonment. To prove the offense of false imprisonment, the State had to prove that Wigiert restrained the victim. "A person commits [false imprisonment] if he intentionally or knowingly restrains another person." TEX. PENAL CODE ANN. § 20.02(a) (Vernon 1994). "Restrain" is defined as follows:

(1) "Restrain" means to restrict a person's movements without consent, so as to interfere substantially with his liberty, by moving him from one place to another or by confining him. Restraint is "without consent" if it is accomplished by:

(A) force, intimidation, or deception....

TEX. PENAL CODE ANN. § 20.01(1) (Vernon 1994). Thus, the "extraneous" offense evidence of which Wigiert complains is evidence of the same offense for which he was on trial. The State offered the evidence of Wigiert's "assault" on Sneed to prove that he restrained her without consent by force, intimidation, and deception. Therefore, by definition, the conduct described as an assault would not be extraneous or extrinsic to the charged conduct, and rule 404(b) is inapplicable. *See* TEX.R.CRIM. EVID. 404(b); *Gillum v. State*, 888 S.W.2d 281, 286 (Tex.App.—El Paso 1994, pet. ref'd).

The trial court acted within the scope of its discretion when it admitted this evidence. We overrule Wigiert's first point of error.

### HEARSAY EXCEPTIONS

Wigiert raises three points of error that challenge hearsay rulings by the trial court. He argues that the trial court erred by admitting hearsay testimony of an "extraneous offense" because the State used it as "evidence of the offense charged" and "no issue relating to the extraneous offense was before the jury." He argues that Conrad's testimony that Sneed ran up to him and told him she had been assaulted in an apartment by Wigiert was inadmissible hearsay. In points of error three and four, Wigiert asserts that the trial court erred in two instances by permitting Moreno to read to the jury parts of her prior statement given to police.

### *Excited Utterance*

■ Conrad's testimony is admissible hearsay because it falls squarely within the "excited utterance" hearsay exception. Rule 803 describes an excited utterance as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." TEX.R.CRIM. EVID. 803(2). Conrad testified as follows:

[STATE'S ATTORNEY:] And when did you first see Ms. Sneed?

[CONRAD:] She came knocking on my window. I saw her coming towards my car.

. . . .

Q. How did she approach your car, walking, running?

A. She was running towards my car.

. . . .

Q. How was she acting when she was knocking on your window?

A. Very, very upset. She was crying. She was very upset.

Q. So you got out of the car?

A. Yes, sir.

Q. All right. When you first saw Ms. Sneed, how did she appear at that time?

A. She wasn't calm.

Q. Was she crying?

A. Yes. You could tell she had been crying, facial—

Q. Did she appear to be upset?

A. Yes.

Q. Was her voice cracking?

A. Yes.

Q. Was she having any difficulty talking to you?

A. She was working with her breath, yes.

Q. Working with her breath?

A. Trying to get her sentences together and stuff like that.

Q. Were you able to learn from Ms. Sneed what the problem was?

A. She told me she had been assaulted.

He then continued to testify that Sneed told him she had been assaulted in an apartment by Wigiert.

Conrad's testimony indicates that Sneed was still under the stress of a startling occurrence, her false imprisonment, when she approached Conrad and made the statements to which he testified. *See McFarland v. State,* 845 S.W.2d 824, 846 (Tex.Crim.App. 1992); *Mathews v. State,* 835 S.W.2d 248, 248 (Tex.App.—Fort Worth 1992, no pet.). Moreover, each statement that she made related to the circumstances of the startling occurrence. *See McFarland,* 845 S.W.2d at 846. The fact that some of her statements called the event an assault rather than a false imprisonment does not make them inadmissible under this exception to the hearsay rule. The trial court did not abuse its discretion by overruling Wigiert's hearsay objection. Accordingly, we overrule point of error two.

### Recorded Recollection

In his next two points of error, Wigiert complains of the trial court permitting Moreno to read to the jury parts of her prior statement given to police. He argues that the prior statement was inadmissible hearsay evidence that is not encompassed by the recorded recollection hearsay exception.

 While it is true that Wigiert's remarks to Moreno are not encompassed by the recorded recollection hearsay exception, those remarks are admissions and, as such, are not hearsay. *See* Tex. R. Crim. Evid. 801(e)(2). Therefore, our review will focus on the admissibility of the document itself. We hold the document is admissible under the recorded recollection hearsay exception. Rule 803 provides for the recorded recollection hearsay exception as follows:

> A memorandum or record concerning a matter about which a witness once had personal knowledge but now has insufficient recollection to enable him to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in his memory and to reflect that knowledge correctly, unless the circumstances of preparation cast doubt on the document's trustworthiness. If admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party.

Tex.R.Crim. Evid. 803(5).

Wigiert concedes that the State met part of the predicate for admissibility under this rule by establishing that Moreno could not remember the events. His argument is that reviewing her statement did not in fact refresh her recollection and that the record does not reflect anything that affirmatively indicates that the statement is trustworthy. He contends that this places the testimony outside the scope of the recorded recollection hearsay exception. Both of these arguments run contrary to the plain language of the rule.

Moreno's testimony regarding whether the statement in fact refreshed her recollection was equivocal. She testified that she remembered, but she also testified that she did not remember. However, this no longer bears any effect on the admissibility of the testimony. *See* Tex.R.Crim. Evid. 803(5). Before the adoption of the rules of criminal evidence, whether reviewing a recorded recollection in fact refreshed a witness's memory was relevant. If the memory was refreshed, the witness could testify to those facts. If it was not, the recorded recollection could be admitted into evidence provided the witness identified the statement and vouched for its correctness. *See Welch v. State,* 576 S.W.2d 638, 641 (Tex.Crim.App. [Panel Op.] 1979).

However under the present rule, it is only necessary that the prior statement be "shown to have been made or adopted by the witness when the matter was fresh in [her] memory and to reflect that knowledge correctly." Tex. R. Crim. Evid. 803(5). The record sufficiently reflects that regardless of whether Moreno remembered the specific facts in her statement, she remembered making the statement and she remembered that the events would have been fresh in her mind when she made it.

> [STATE'S ATTORNEY:] Okay. Why does that statement there help you refresh your memory?

[MORENO:] That? I remember that. That's—I remember that.

Q. It's everything else, because it was so long ago?

A. Yeah, it was a long time ago.

Q. Is that statement written in your handwriting?

A. Yes.

Q. And did you sign that statement?

A. Yes.

Q. And did somebody witness you sign that statement?

A. Yes.

Q. And who witnessed you sign that statement?

A. A police officer.

. . . .

Q. Okay. Would you have written that statement out when the events in question were fresh in your memory?

A. Yes.

. . . .

Q. And when you could have recalled the events readily?

A. Yes. . . .

Although Moreno did not specifically testify that the statement was accurate when made, she did not recant any part of her statement at trial and she originally made the statement under circumstances that support its reliability. *See Phea v. State,* 767 S.W.2d 263, 268 (Tex.App.—Amarillo 1989, pet. ref'd). Moreno wrote this statement out herself and signed it before a police officer just a few days after the incident. Absent any showing that the statement is inaccurate, the general tenor of her testimony shows sufficient truthfulness to support a finding that the statement correctly reflects the knowledge Moreno had when she made it.

As regards any further affirmative proof of trustworthiness, provided "the circumstances

of preparation cast doubt on the document's trustworthiness," the rule does not require any indicia of reliability beyond the provisions of the rule. *See Phea,* 767 S.W.2d at 267. Moreno wrote the statement out herself and signed it before a witness who was a police officer. Wigiert has put forth no circumstances casting doubt on this document's trustworthiness.

We hold that the trial court did not abuse its discretion when it ruled testimony from Moreno's prior statement to police was admissible hearsay under the recorded recollection exception. Thus, we overrule Wigiert's third and fourth points of error.

BOLSTERING

 In his final point of error, Wigiert contends that the trial court erred by permitting the State to impermissibly bolster Sneed's unimpeached testimony. Since the adoption of the Texas Rules of Criminal Evidence, the Court of Criminal Appeals has refined its definition of bolstering:

> "Bolstering" may perhaps be understood a little more precisely to be any evidence the sole purpose of which is to convince the factfinder that a particular witness or source of evidence is worthy of credit, without substantively contributing "to make the existence of [a] fact that is of consequence to the determination of the action more or less probable than it would be without the evidence."

*Cohn v. State,* 849 S.W.2d 817, 819–20 (Tex. Crim.App.1993) (citing TEX.R.CRIM. EVID. 401) (alteration in original); *see also Solomon v. State,* 854 S.W.2d 265, 269 (Tex. App.—Fort Worth 1993, no pet.). Accordingly, if the evidence makes any substantive contribution, if it even incrementally tends to further establish a fact of consequence, it is not bolstering. *See Cohn,* 849 S.W.2d at 819–20.[1]

---

1. In fact, there is some question regarding whether objecting to offered evidence as "bolstering" remains sufficiently specific to properly preserve error.

 Prior to the adoption of the Rules of Evidence, "bolstering" was a proper objection when one item of evidence was used by a party to add credence or weight to some earlier unimpeached evidence that the same party had offered. Under case law existing prior to the promulgation of the Rules of Evidence, bolstering an unimpeached witness was "automatically" error. The Rules of Evidence, however, do not contain a specific rule pertaining to or prohibiting "bolstering." Moreover, nothing in the Rules prevents a party from adding credence to an unimpeached witness or adding credence to other evidence as long as that

In the present case, Wigiert complains of Conrad's testimony that Sneed told him she had been assaulted and his testimony regarding her condition and demeanor immediately after the incident. He argues that this is substantially the same testimony as that provided by Sneed and "the State was in essence fortifying a part of the wall that had not been attacked." However, our review of the record does not indicate that Sneed's testimony stood unimpeached. Wigiert's attorney cross-examined Sneed, challenging the accuracy of her statement to police as compared to her testimony.

[DEFENSE ATTORNEY:] Okay. Now during this time, when you finally got to the front door, were you telling John, "I want to leave"?

[SNEED:] Yes. I said, "Let me out."

Q. Did you put that in your statement?

A. Not that I recall.

Q. Do you want to look to make sure?

A. No.

Q. But you said that you recalled everything that happened and that this was a very accurate statement because it was given just a couple of days after this incident allegedly occurred; is that right?

A. The things that are in there are accurate.

. . . .

Q. This is an accurate statement?

A. Yes.

Q. Don't you think it would be very important to put in there that, "I was telling John Wigiert that I wanted to leave and he wasn't letting me leave"?

A. Now I do.

Q. Now you do, four years later, right?

A. I assumed that if I was fighting to get out, that he understood that I wanted out.

. . . .

Q. And didn't Mr. Wigiert tell you just to leave him alone during this incident?

A. Yes, and I did leave him alone.

Q. Didn't he say that? Didn't he just say, "Leave me alone"?

A. He said, "Leave my friends alone."

[Q.] Could I approach the witness?

THE COURT: Yes.

Q. What does that say right there? He said, "You leave me alone." Did he not say that?

A. Yes.

Q. Does it say anything about leaving my friends alone?

A. No, but it does say, "Let me go."

Further, defense counsel emphasized that Sneed continued to associate with Wigiert after the incident and asked her several times whether she actually left with Wigiert after the offense rather than by herself as she had testified.

[DEFENSE ATTORNEY:] Now, in fact, you continued this relationship with Mr. Wigiert after this incident; is that not correct?

[SNEED:] I associated with him.

Q. Did you ever go out with him?

A. I went out with lots of people at the same time.

Q. Did you go out with Mr. Wigiert?

A. Yes.

Q. Okay. So you weren't pissed enough at him that you didn't want to go out with him anymore, right?

A. For a while I was.

Q. Okay. Until 1992, December of 1992, which was three months—I'm sorry, which was 15 months later.

A. What is the question?

Q. All right. What I asked you was, you weren't mad enough at Mr. Wigiert over this incident that you didn't go out with him anymore.

A. Correct.

---

additional evidence is relevant. In fact, the Rules favor admissibility. Therefore, if such "bolstering" evidence is presented, the party seeking exclusion must object in accord with the Rules of Evidence so as to inform the trial court that the evidence is not relevant (Rule 402), the evidence is substantially prejudicial, confusing, needlessly cumulative (Rule 403), or otherwise specify a rule or reason found in the Rules to exclude the evidence. *Cohn*, 849 S.W.2d at 821 (Campbell, J., concurring) (citations omitted).

Q. All right. And you continued going out with him for another, I'm sorry, 14 months.

A. Yes.

Q. Okay. Now, after you left the apartment, didn't you leave with Mr. Wigiert?

A. No.

Q. You didn't go out the door together?

A. No.

. . . .

Q. Okay. But also you said that Mr. Wigiert did not leave with you; is that correct?

A. He did not leave with me. Oh, he followed me—we did not leave together. He followed me, pushing me.

Q. Okay. Now which one is right? Did you leave with him outside the door, or did he stay inside?

A. He followed me.

. . . .

Q. All right. Ms. Sneed, you went out with Mr. Wigiert for a period of almost five years; is that correct?

A. Off and on. There were several months I never saw him.

Q. But from 1987 to 1992, in December of—

A. We were friends. What do you define "go out with"?

Q. I mean go out and have a beer, go out to the movies, or go out and eat barbecue.

A. Yes, but with other people around us.

He also questioned her implying that she was making these allegations because Wigiert was living with someone else.

[DEFENSE ATTORNEY:] All right. So you went out with him sometimes?

[SNEED:] Sometimes.

Q. And he was living with a friend of yours now; is that correct?

A. Yes.

Q. Isn't that why you were pissed at Mr. Wigiert?

A. No.

Thus, Sneed's credibility was impeached during cross-examination. Conrad's testimony was an attempt to rehabilitate Sneed's credibility and rebut some of the implications that defense counsel's cross-examination of Sneed raised.

Moreover, it cannot be said that Conrad's testimony did not at least incrementally tend to further establish facts of consequence, i.e., that Sneed was upset and frightened, that she thought she had been assaulted, and that someone appeared to be in the apartment but no one would answer the door. *See Cohn*, 849 S.W.2d at 819–20. We hold that the trial court did not abuse its discretion by determining that Conrad's testimony was more than simple bolstering of Sneed's testimony. Consequently, we overrule Wigiert's final point of error.

CONCLUSION

In summary, the trial court acted within the scope of its discretion when it admitted evidence that Wigiert had "assaulted" Sneed because it was not extraneous to the charged offense. Moreover, the trial court did not abuse its discretion when it ruled that Conrad's testimony regarding what Sneed told him was admissible hearsay because she was under the stress of a startling occurrence when she made the statements. Further, it was not an abuse of discretion for the trial court to permit Moreno to read parts of her prior statement to police. Although Moreno could not remember the specific facts in the statement, she remembered making the statement and she remembered that the events would have been fresh in her mind when she made it. Additional indicia of the statement's reliability are not required because the circumstances of preparation do not cast doubt on the document's trustworthiness. Additionally, Conrad's testimony was not impermissible bolstering of Sneed's testimony because Sneed's testimony did not stand unimpeached and Conrad's testimony at least incrementally tended to further establish facts of consequence.

Accordingly, we affirm the judgment of the trial court.