Darrius Eugene SPEARMAN, Appellant,

v.

The STATE of Texas, Appellee.

No. 09–09–00228–CR.

Court of Appeals of Texas, Beaumont.

Submitted Dec. 29, 2009.

Decided Feb. 10, 2010.

Hugh O'Fiel, Beaumont, for appellant.

Tom Maness, Crim. Dist. Atty., Wayln G. Thompson, Asst. Dist. Atty., Beaumont, for state.

Before McKEITHEN, C.J., GAULTNEY and HORTON, JJ.

## OPINION

DAVID GAULTNEY, Justice.

A jury found Darrius Eugene Spearman guilty of murder and assessed punishment at confinement in prison for fifty years. Spearman challenges the legal and factual sufficiency of the evidence to support the jury's guilty verdict and rejection of his self-defense claim. He also argues the trial court erred in allowing a witness's statement to be read to the jury. We conclude the evidence is sufficient to support the verdict, and although the evidentiary ruling did not strictly follow a Court of Criminal Appeals' opinion construing the applicable hearsay exception, we conclude any error did not affect substantial rights. Accordingly, we affirm the judgment of the trial court.

THE SUFFICIENCY STANDARDS OF REVIEW

Spearman first challenges the sufficiency of the evidence supporting the jury's finding that he intentionally caused the victim's death by shooting him with a firearm. *See* TEX. PEN.CODE ANN. § 19.02(b)(1) (Vernon 2003). In reviewing the legal sufficiency of the evidence, an appellate court reviews all of the evidence in a light most favorable to the verdict, and must decide if any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. *Evans v. State,* 202 S.W.3d 158, 161 (Tex.Crim.App.2006). When conducting a factual sufficiency review, a court views the evidence in a neutral light and asks whether the evidence supporting the verdict is so weak, or the verdict is so against the great weight and preponderance of the evidence, as to render the verdict manifestly unjust. *Grotti v. State,* 273 S.W.3d 273, 283 (Tex.Crim. App.2008).

Spearman specifically challenges the jury's rejection of his self-defense claim. Spearman asserts the record "is wholly void of any evidence that the defendant acted intentionally in causing the death of the victim; but, in fact was acting in self-defense to prevent himself from being shot." He also states that the record demonstrates that "the pistol accidentally discharged in the struggle wherein the defendant was attempting to restrain the victim from shooting the defendant."

When a defensive issue under section 2.03 of the Penal Code is contemplated, the defendant bears the burden of producing some evidence that supports the particular defense and, once accomplished, the State then bears the burden of persuasion to disprove the raised defense. *See* TEX. PEN. CODE ANN. § 2.03(d) (Vernon 2003); *Adelman v. State,* 828 S.W.2d 418, 421 (Tex. Crim.App.1992). The State's burden "requires only that the State prove its case beyond a reasonable doubt." *Zuliani v. State,* 97 S.W.3d 589, 594 (Tex.Crim.App. 2003) (citing *Saxton v. State,* 804 S.W.2d 910, 913 (Tex.Crim.App.1991)). "When a

jury finds the defendant guilty, there is an implicit finding against the defensive theory." *Id.* (citing *Saxton,* 804 S.W.2d at 914). In reviewing the sufficiency of the evidence to support a verdict of guilt, an appellate court looks at the sufficiency of the evidence to support both the verdict and the rejection of the defense. *See Zuliani,* 97 S.W.3d at 594–95; *Saxton,* 804 S.W.2d at 913–14.

### The Evidence

Meyoshia Carter–Smith testified that she was at Tiffany's, a club in Port Arthur, on the night of the shooting. The club was extremely crowded. Carter–Smith described some of the attendees as "gang-bangers." At about 1:30 in the morning, the disc jockey played a song that encouraged the club patrons to "throw your sets up[,]" and some of the patrons began "making [gang] signs" and "throwing their [gang] rags up."

Carter–Smith was leaning on a railing near the dance floor. She noticed a man she knew as "Fish," later identified as Marcus Allen, dancing with a girl on the dance floor. The girl was about "two, three big steps" away from Carter–Smith. When the lyrics to the song said to "throw your sets up," Allen did not "throw his set up" but kept his hands on the hips of the girl.

Spearman made a hand gesture and approached Allen. The witness could not hear what was being said because of the noise level at the club. Allen tried to waive Spearman off. Carter–Smith then heard song lyrics which said to "put your guns in the air." She saw Spearman approach Allen with a gun covered by a red bandana. She did not hear a distinct gunshot, because the song included the sound of gunshots, but she saw a flicker "[l]ike a little firecracker[.]" She knew Allen had been shot. Just before Allen fell to the floor, she saw the gun in Spearman's hand. She later testified that she "never actually" saw a gun—"I seen, like, a flashlight and I seen somebody drop. So, I assumed that it was a gun covered."

When Allen fell to the floor, people started kicking him. Spearman was out of sight. She identified one of the people kicking Allen as a man referred to as "KT" by others that night, and she later found out KT's name is "Korwin." The club owner and a bouncer broke up the fight and took Allen out of the club. Carter–Smith "could tell that he was unconscious because ... he wasn't moving." The club was shut down.

Carter–Smith called 911, went outside the club, and saw Allen lying near the club's door. After determining his pulse was weakening and he was not breathing, she began administering CPR. Allen's eyes began "rolling back in his head[.]" The police and EMS arrived; the police asked Carter–Smith to leave.

At the time of the shooting, Carter–Smith had been at the club for about three and a half hours and had consumed four mixed drinks containing tequila. She testified she was "tipsy," but she claimed she was not intoxicated and "not under the influence that I didn't see what I seen."

Easton Washington, a bouncer at the club that night, was the only employee searching the patrons for weapons as they entered the club. Washington testified that when the disc jockey announced there was a fight, Washington ran to the dance floor. Gerald Hatch, the club owner, was holding one man, and another man was "balled up in a knot" on the floor while others were "[k]icking him and stomping him." Washington threw some people off the man balled up on the floor, picked the man up, and began helping him out the door. The man told Washington, " 'Call

my mama.' " Washington got the man outside. He saw no blood. A woman then walked up, examined Allen, and said " 'it look[s] like he's been shot or stabbed[;]' " she began administering CPR.

Hatch testified he had been drinking alcohol that evening, but he was not intoxicated. When he heard of the fighting, he ran to the dance floor and grabbed a man attacking Allen. Once Hatch got him to the door, the man "took off running." Spearman did not look like the man that he escorted out of the club. Hatch observed Washington helping someone to the outside that appeared injured.

Quavonn White, who at the time of trial was serving a sentence for aggravated robbery, testified that he had known Spearman for five or six years. White went to Tiffany's that night after "smoking weed" earlier that day. As he was about to enter the club, Spearman asked him for a ride home. Spearman did not tell him anything that happened at the club. When White returned to the club, everyone was outside, and the club was closed.

Korwin Thomas, Spearman's friend and former fellow gang member, testified he arrived at Tiffany's around midnight. He was high on PCP. Thomas told the police that when a rap song came on, Allen and his friends started waving their blue flags and Thomas and others started waving red flags. A fight broke out. According to Thomas's statement to the police, prior to the shooting Spearman had said in Thomas's presence that he planned to kill Allen if he saw him at the club. Thomas said in his statement that he saw Spearman pull out a 9 millimeter and Thomas left because he knew Spearman was about to shoot Allen. Thomas explained in his statement that he heard a shot, ran back to the dance floor, and saw Allen lying on the dance floor.

In custody on a felony charge at the time of trial, Thomas testified that he did not remember making the statement to the police, and that he was under the influence of narcotics when he gave his statement. He testified at trial he did not see Spearman with a gun at the club that night.

When Officer Matthew Bulls of the Port Arthur Police Department arrived at Tiffany's that night, he found a big crowd outside the club. A woman had tried to administer CPR to the victim. EMS arrived shortly thereafter and could not successfully resuscitate Allen. Bulls noted Allen suffered a gun-shot wound but he saw a "minimal" amount of blood. He spoke with Hatch and Washington. No spent shells, weapons, or blood were found in the club.

Detective Herbert Otis with the Port Arthur Police Department testified that he assisted in the investigation. He was asked to look for the suspect in an area of Port Arthur. He and Detective Savoie found Spearman driving a car in that area. Spearman was taken into custody on an unrelated matter.

When interviewed, Spearman initially denied being at the club. He later admitted he was at the club and described what happened. Spearman told Otis that while a gang song was playing, Allen "stood in [Spearman's] face" and was "throwing up signs" and "waving stuff." Spearman shot him. Spearman did not tell Otis of any other threatening action by Allen, nor did he claim that he saw Allen with a weapon.

Spearman told Otis he was prepared to give a formal written statement. He gave that statement to Detective Savoie. Spearman's statement to Savoie stated that Allen pulled a handgun on Spearman. Spearman grabbed the gun by putting his hand on top of Allen's, then turned the gun towards Allen, and pulled the trigger.

Otis obtained a statement from Korwin Thomas. Thomas appeared tired at times, but his responses were cogent and he did not claim to be under the influence of any narcotics.

Tommy Brown, a forensic pathologist, performed the autopsy on Allen. Brown testified that a single gunshot wound caused Allen's death. Based on the direction the .22 caliber bullet traveled, Brown believed Allen was shot in the back. Brown did not examine Allen's hands for gunshot residue. There was nothing on Allen's body to indicate the gunshot was a close-range shot. The bullet went through the heart.

Spearman testified in his defense. He denied saying that he was going to kill Allen. He knew Allen. They had attended the same high school. They were members of rival gangs. Before the night of the shooting, he and Allen had not fought each other, but anytime their respective gangs "met up in the club[,]" there was a fight between the gangs.

Spearman arrived at Tiffany's around 11:00 p.m. the night of the shooting. He had been smoking marijuana. He was searched at the door for weapons. Once inside, he heard a song that "g[ot him] fired up." He liked the song. Spearman approached the dance floor and began "throwing up [his] signs." He testified that the "song gets me fired up and at that time when I was claiming my set, I just felt like I was a gangsta and I threw up—representing my set at the time." He explained that he saw "Fish" on the dance floor, and "we started throwing up our signs; and he was throwing up his. So, we was, like, right next to each other. He was throwing up his and I start throwing up mine and when you're throwing up signs, it's a sign of disrespecting another set and we start fighting."

After Spearman hit Allen, Allen fell back into someone. Spearman testified that when Allen "came [back] up, he had a gun . . . in his left hand." Spearman grabbed the gun with his right hand over Allen's left hand and while they wrestled with the gun, the gun discharged. Allen fell to the ground, leaving the gun in Spearman's hand. Spearman dropped the gun, kicked it, and quickly walked out of the club. He saw Quavonn White outside the club. Spearman told White to take him home. The next day, the police obtained a statement from Spearman. Spearman denied Korwin Thomas's written statement that Spearman pulled out a 9 millimeter on Allen, but acknowledged that he saw "KT" at the club that night.

Marcus Allen's father testified in rebuttal that his son was right-handed.

### THE SELF-DEFENSE CLAIM

The only testimony at trial in support of Spearman's claim that he acted in self-defense was his own. He testified as follows:

Q. Well, you said you grabbed the gun when you saw it in Fish's hand?

A. Yes, sir.

Q. What did you think he was getting ready to do?

A. I thought he was fixing to shoot me.

Q. Why didn't you turn and run away?

A. It was too packed to run.

Q. Did you—why did you grab the gun?

A. That's the only thing I thought would have helped me out.

Q. Did you want to stop him from shooting?

A. I really was trying to take it from him, but he was yanking back.

Q. Well, in your statement, do you remember telling the police what happened?

A. Yes, sir.

Q. And what did you tell them happened?

A. I told them that I had my hand on it, and I was trying to—I was—I said I had my hand on it and I was, like, trying to turn it towards him, like, trying to take it out of his hand.

Q. Now did you apply pressure on it too?

A. On his hand. I had my hand over his hand.

Q. And did you tell police that?

A. Yes, sir.

Q. Did you know the gun went off at some point?

A. Yes, sir.

On cross-examination, Spearman elaborated on his actions that night:

Q. If you're trying to take [the gun] from him, how come you're pushing on it instead of pulling it out of his hand?

A. I don't know.

Q. I mean, when you try and take something from somebody, don't you try and pull it out of their hand?

A. But at the same time, I'm trying to turn it on him because he got—it's a gun facing towards me.

Q. So, you're trying to—now you're certain not only are you trying to defend yourself, but you're trying to turn the gun on him. That is your intention; is that correct? Because that's what you just said.

A. I guess so.

### SUFFICIENCY OF THE EVIDENCE

█ The jury, as trier of fact, is the sole judge of the credibility of the witnesses and the weight to be given the testimony, and may accept or reject all or any part of a witness's testimony. *See Lancon v. State,* 253 S.W.3d 699, 707 (Tex. Crim.App.2008); *Moore v. State,* 935 S.W.2d 124, 126 (Tex.Crim.App.1996). A rational jury could conclude Spearman intentionally caused Allen's death by shooting him with a firearm. *See Evans,* 202 S.W.3d at 161. The jury could reasonably reject some or all of the defendant's testimony, and accept the testimony of those witnesses called by the State. The evidence, viewed in the light most favorable to the verdict, is legally sufficient to support the jury's rejection of Spearman's claim of self-defense. When the evidence is viewed in a neutral light for factual sufficiency purposes, the evidence is also sufficient to support the verdict and the rejection of the self-defense claim. *See Whipple v. State,* 281 S.W.3d 482, 498 (Tex.App.-El Paso 2008, pet. ref'd). Issues one and two are overruled.

### THE EVIDENTIARY RULING

█ In his third issue, Spearman challenges the trial court's decision to allow Thomas's statement to be read to the jury. Spearman argues the statement was inadmissible hearsay because the State failed to lay the proper predicate for the statement's admission under Texas Rule of Evidence 803(5). Rule of Evidence 803(5) provides that

> [t]he following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> . . . .
>
> (5) Recorded Recollection. A memorandum or record concerning a matter about which a witness once had personal knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witness'

memory and to reflect that knowledge correctly, unless the circumstances of preparation cast doubt on the document's trustworthiness. If admitted, the memorandum of record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party.

TEX.R. EVID. 803(5).

The State, as proponent of the evidence, had the burden of showing that Thomas's statement was admissible under the hearsay exception. *See Cofield v. State,* 891 S.W.2d 952, 954 (Tex.Crim.App. 1994). The trial judge considers relevant and reliable materials and testimony when making decisions on the admissibility of evidence. *See* TEX.R. EVID. 104(a); *Johnson v. State,* 803 S.W.2d 272, 284 n. 10 (Tex.Crim.App.1990). Four prerequisites must be shown under Rule 803(5). *Johnson v. State,* 967 S.W.2d 410, 416 (Tex. Crim.App.1998). First, the witness must have "insufficient recollection to enable the witness to testify fully and accurately" about the event; second, the "memorandum or record" must be one "made or adopted by the witness"; third, the recollection must have been recorded "when the matter was fresh in the witness' memory"; and fourth, the recorded recollection must "reflect" the witness's prior "knowledge correctly[.]" *See* TEX.R. EVID. 803(5).

In this case, the judge heard Thomas testify he did not remember all the things the prosecutor asked him about and that he was high on PCP "24/7 at that time." Although Thomas testified to some recollection of that night, the trial court could reasonably conclude that he was not able to testify "fully" because of insufficient recollection. The witness acknowledged his signature on the statement, and the officer said the witness read the statement after the officer typed it and before the witness signed it. The judge therefore

could reasonably conclude the statement was "made or adopted" by Thomas. *See Phea v. State,* 767 S.W.2d 263, 267 (Tex. App.-Amarillo 1989, pet. ref'd). The statement was signed within days of the shooting. The trial court could also reasonably conclude the event was "fresh in the witness' memory" at that time. *See Kuczaj v. State,* 848 S.W.2d 284, 288 (Tex.App.-Fort Worth 1993, no pet.).

Concerning the fourth requirement— that the recorded recollection must "reflect" the witness's prior "knowledge correctly"—the trial court found that although the substance of Thomas's testimony was that he did not remember making the statement, "he did acknowledge that he must have made it," because his signature and initials were on the document. In the sworn statement, Thomas said he was at the club that night and witnessed the shooting; he admitted that after Allen was shot, Thomas and others kicked Allen. His statement also indicated that prior to the night of the shooting, Thomas had overheard Spearman say he was planning to kill Allen. At trial, Thomas admitted being at the club and seeing Allen taken out of the club, but he denied seeing the shooting or seeing Spearman with a gun. He denied kicking Allen after he had been shot. He also denied hearing Spearman say he would kill Allen.

Thomas signed the sworn statement on a "suspect" form and provided it to the police after he had initialed and acknowledged his rights. Officer Otis testified he asked Thomas to review the statement and then sign it. Thomas identified his signature and initials on the statement at trial, and testified that although he did not remember making the statement, he "must have had." Otis testified Thomas answered his questions in a cogent manner.

Although Thomas claimed at trial that he did not remember making the statement because he was under the influence of drugs "24/7," he did not tell Otis he was under the influence of drugs.

Under the circumstances in this case, the trial court could reasonably conclude that the witness's purported lack of recollection on certain matters, along with the inconsistencies between the statement and the witness's testimony, reflected an attempt to avoid hurting a friend and former fellow gang member. *See, e.g., U.S. v. Insana,* 423 F.2d 1165, 1170 (2nd Cir.1970) ("Where ... a recalcitrant witness who has testified to one or more relevant facts indicates by his conduct that the reason for his failure to continue to so testify is not a lack of memory but a desire 'not to hurt any one,' then the court has discretionary latitude in the search for truth, to admit a prior sworn statement which the witness does not in fact deny he made."). Considering the testimony of other witnesses and the circumstantial evidence, as well as the declarant's admissions, denials, and equivocations, we believe the trial court could reasonably conclude that the sworn statement reflected the witness's prior knowledge correctly. *See* TEX.R. EVID. 803(5); TEX.R. EVID. 102 (evidence rules are to be construed "to the end that the truth may be ascertained and proceedings justly determined"); *Wigiert v. State,* 948 S.W.2d 54, 59 (Tex.App.-Fort Worth 1997, no pet.) (written and signed statement admitted although the witness did not testify specifically that the statement was accurate; she did not recant the statement at trial, and the statement was made to the police "under circumstances that support its reliability"); *In the Matter of J.W.,* No. 10–09–00127–CV, 2009 WL 5155784, **2–3, 2009 Tex.App. LEXIS 9830, **5–6 (Tex.App.-Waco Dec. 30, 2009, no pet. h.) (statement by witness who recognized her signature on the statement was admitted under Rule

803(5) based on officer's testimony that the witness told the officer at the time she made the statement that it was true).

■ The Rule has been construed more restrictively, however. In *Johnson,* 967 S.W.2d at 416, the Court of Criminal Appeals held that, to satisfy the fourth requirement, "the witness must acknowledge at trial the accuracy of the statement." Thomas did not expressly acknowledge the accuracy of the statement at trial. The sworn statement records that Thomas saw Spearman pull out a gun, that Thomas left the area because Spearman had told him earlier he was going to kill Allen, and that Thomas and his friends kicked Allen after he had been shot. At trial, Thomas testified he did not see Spearman with a gun at the club that night, he had not overheard Spearman say he was going to kill Allen, and Thomas had not kicked Allen after Allen was shot. Assuming the Rule's language must be restrictively construed as in *Johnson,* the statement was not admissible as a recorded recollection because Thomas did not at trial "vouch for the accuracy" of his prior statement. *See id.* ("the witness must vouch for the accuracy of the written memorandum").

■ A trial court ruling admitting evidence for a wrong reason will not require reversal if a valid reason for the admission exists. *See Romero v. State,* 800 S.W.2d 539, 543 (Tex.Crim.App.1990). The inconsistent statement here, however, was not given "under oath subject to the penalty of perjury at a trial, hearing, or other proceeding except a grand jury proceeding in a criminal case, or in a deposition," so it was not separately admissible as substantive evidence under Rule 801(e)(1)(A) (inconsistent prior statement of witness). *See* TEX.R. EVID. 801(e)(1)(A). The statement was useful for impeachment, nevertheless, because the witness testified at

trial that he did not see the shooting and did not hear the defendant's statement of intent to kill. *See, e.g., U.S. v. Bigham,* 812 F.2d 943, 946–47 (5th Cir.1987); *see also Aranda v. State,* 736 S.W.2d 702, 707 (Tex.Crim.App.1987) (A prior inconsistent statement used solely for the purpose of impeachment is not substantive evidence against the criminal defendant.). We also note that portions of the statement were admissible as a statement against interest. *See* Tex.R. Evid. 803(24); *Walter v. State,* 267 S.W.3d 883, 890–91 (Tex.Crim.App. 2008).

■ Appellant argues in his brief in this Court that "[i]n fact, the colloquy between the prosecutor and the witness totally informs the jury of the contents of the statement prior to its introduction, which was admitted in error." No objection was made when the prosecutor read key portions of the statement while questioning Thomas, and no limiting instruction was requested or provided. *See Goodman v. State,* 665 S.W.2d 788, 792 (Tex.Crim.App. 1984). No error was preserved on that partial reading. *See* Tex.R.App. P. 33.1. Generally, inadmissible evidence may be harmless if, without objection, the jury hears the same evidence at another time. *See Anderson v. State,* 717 S.W.2d 622, 628 (Tex.Crim.App.1986).

In deciding whether a new trial is required, we must determine whether the error affected "substantial rights." *See* Tex.R.App. P. 44.2(b); *see also King v. State,* 953 S.W.2d 266, 271 (Tex.Crim.App. 1997). Considering the complete record, including the defendant's own statements to the police, his testimony at trial, and Thomas's trial testimony, we conclude the challenged evidentiary ruling does not require reversal of the judgment. *See Johnson,* 967 S.W.2d at 417. Issue three is overruled.

The judgment is affirmed.

AFFIRMED.